## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOSEPH MERCER                              :    CIVIL NO.
    PLAINTIFF                             :

VS.                                        :

DORA B. SCHRIRO, COMMISSIONER :
OF THE DEPARTMENT OF                       :
EMERGENCY SERVICES AND PUBLIC:
PROTECTION, THE CONNECTICUT                :
STATE POLICE UNION, INC., AND              :
ANDREW MATTHEWS, PRESIDENT :
OF CONNECTICUT STATE POLICE                :
UNION, INC.                                :
    DEFENDANTS                            :    FEBRUARY 29, 2016

### COMPLAINT

Plaintiff Sergeant Joseph Mercer ("Sgt. Mercer"), by and through his undersigned

attorneys, files this Complaint against Defendants Dora B. Schriro, Commissioner of the

Department of Emergency Services and Public Protection ("Schriro" or "Commissioner"),

The Connecticut State Police Union, Inc. ("CSPU" or "Union"), and Andrew Matthews,

President of the Union ("Matthews"), and allege:

### INTRODUCTION

1.    This is a civil rights action pursuant to the Federal Civil Rights Act of 1871, 42

U.S.C. § 1983 for declaratory, injunctive, monetary, and equitable relief to redress the

violation of Sgt. Mercer's rights under the First and Fourteenth Amendments to the United

States Constitution for exercising his right to be a nonmember of the Union, refrain from

funding the Union's political and non-bargaining activities, and to advocate on behalf of the

rights of nonmembers. Defendants retaliated against Sgt. Mercer by transferring his job from a supervisory, command position to one that is mostly administrative, resulting in the loss of significant potential pensionable overtime and reputation.

## JURISDICTION AND VENUE

2.      This action arises under the First and Fourteenth Amendments to the United States Constitution. This Court's jurisdiction is properly invoked under 28 U.S.C. § 1331.

3.      Jurisdiction is also invoked under 28 U.S.C. § 1343 because Sgt. Mercer seeks relief under 42 U.S.C. § 1983 to redress the deprivation by state actors and/or under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

4.      Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all other related claims under Connecticut General Statutes § 31-51q. Sgt. Mercer's state law claim forms an inextricable part of the same case and controversy involving the deprivations of his rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

5.      Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court may declare the rights of the Plaintiff and grant further necessary or proper relief based thereon.

6.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because the Defendants reside, have offices in, conduct their business in this judicial district, and because the events giving rise to the claims occurred in this judicial district.

LAW OFFICES
BIFE AND CEDERHILL, P.C.
1471 ... Street • Manchester, CT 06040 • (860) 646-5000 • Juris No. 028012

**PARTIES**

7.　　Plaintiff Joseph Mercer is, and was at all times mentioned herein, employed by the State of Connecticut's Department of Emergency Services and Public Protection ("DESPP"), within the State Police division ("State Police division" or "State Police"), as a sergeant. The rank of sergeant is included in the certified "State Police [NP-1]" bargaining unit ("NP-1 bargaining unit") and is represented exclusively for purposes of collective bargaining by Defendant CSPU. As such, he is an "employee" within the meaning of the State Employees Relations Act ("SERA"), Connecticut General Statutes § 5-270(b).

8.　　Defendant Dora B. Schriro, Commissioner of the DESPP, maintains her office in Middletown, Connecticut, from which she regularly transacts business related to her role as the commanding officer of DESPP. Pursuant to Connecticut General Statutes § 29-1b(a), Schriro, as Commissioner, is the commanding officer of the State Police division within DESPP. She is responsible for developing policies, enforcing and executing all rules and regulations, and overseeing the general supervision of all the various departments, offices, and units within DESPP and the State Police division. Schriro is an "employer" within the meaning of Connecticut General Statutes § 5-270(a). She is sued in both her official and individual capacities.

9.　　Defendant CSPU is a Connecticut corporation with its principal place of business at 500 Main Street, East Hartford, Connecticut. CSPU is an "employee organization" within the meaning of the SERA, Conn. Gen. Stat. § 5-270(d). CSPU is the

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 Center Street • Manchester, CT 06040 • (860)646-5606 • Juris No. 402790

"exclusive bargaining representative," pursuant to the SERA, Connecticut General Statutes §§ 5-270 and 5-280, inclusive, for all employees of the State of Connecticut with the rankings of trooper, trooper first class, sergeant, and master sergeant in the certified NP-1 bargaining unit.

10.     Defendant Andrew Matthews, President of Defendant Union, maintains his office at the Union headquarters located at 500 Main Street, East Hartford, Connecticut.  As Union President, Matthews' duties include, among others, representing the Union at labor/management meetings with the State Police command staff, including the Commissioner, organizing meetings for Union members, advocating for issues raised by Union members before State Police management, and filing grievances on behalf of the Union and/or unit members.

## STATEMENT OF FACTS

11.     On or about November 14, 2014, Sgt. Mercer, resigned his union membership and objected to paying for the Union's expenses unrelated to collective bargaining, contract administration, and grievance adjustment.

12.     At various times since on or about November 2014, Sgt. Mercer informed coworkers of their right to resign from the Union.

13.     Also in November 2014, two state troopers, Troopers First Class ("Tfc.") Carson Konow ("C. Konow") and Collin Konow ("Co. Konow") resigned their union membership in Defendant Union and objected to paying full union dues.  Defendant Union

4

failed to provide them with certain constitutionally required minimum safeguards prior to seizing union fees from them. Consequently, Sgt. Mercer, Tfc. C. Konow, Tfc. Co. Konow, and a recently retired state trooper, Marc Lamberty, filed a federal civil rights lawsuit against the Union and certain state officials for violating their First Amendment rights. The lawsuit was publicized in several local news media.

14. Since November 2014, Defendant Union and/or its officers, representatives, employees, agents, etc. have expressed, in various ways, opposition to Sgt. Mercer and the other state troopers' nonmembership, their lawsuit, and their advocacy on behalf of the rights of nonmembers.

15. At the time of his resignation from the Union, Sgt. Mercer was employed full-time as a resident State Police Trooper for Colchester, Connecticut. As Resident Trooper, Sgt. Mercer acted as a local chief of police, in that he supervised the daily operations of the local police department, which employed twelve municipal police officers.

16. In addition to this full-time position, Sgt. Mercer was employed part-time in the State Police Tactical Unit ("SWAT"), which is part of the Emergency Services division within the State Police. Both positions are in the NP-1 bargaining unit represented by CSPU.

17. On or about April 30, 2015, Major Mike Darcy ("Maj. Darcy"), the senior commanding officer for Emergency Services, appointed Sgt. Mercer to the full-time supervisory position of Operations Sergeant. Operations Sergeant is a NP-1 bargaining unit position. Sgt. Mercer's transfer was effective on or about May 15, 2015.

5

18.     Other than the position of bomb technician, the Operations Sergeant position is one of the few full-time positions within the Emergency Services division. It is a highly prestigious, desired command position with significant supervisory authority over the "elite" Emergency Services' state police force. The Operations Sergeant oversees over 150 state policemen assigned to the multiple divisions of Emergency Services; supervises operations and training within the division, including but not limited to organizing high profile events and security, and co-commanding high risk operations and distress calls, and organizes and supervises training events. The Operations Sergeant also applies and administers federal and state grants, evaluates and inspects personnel, equipment, weaponry, etc., and performs other administrative duties. The Operations Sergeant position has an increased financial benefit due to the considerable potential for pensionable overtime pay.

19.     At the time of his appointment, Sgt. Mercer was one of the most senior veterans of SWAT, with seventeen years of experience, and was the senior sergeant on SWAT, with eleven years of experience. Sgt. Mercer was also one of the most experienced members on SWAT in that he: served on the entry team for hundreds of high risk SWAT operations; served as interim team leader for one of the SWAT teams which he supervised in the assigned team leader's absence; and completed multiple trainings and certifications in areas instrumental to the field. In addition to his SWAT experience, Sgt. Mercer had served as a patrol supervisor for three separate troops, the Resident State Trooper Supervisor and Field Training Officer for another troop, an Internal Affairs

6

Investigator, and a Resident Trooper for Colchester, Connecticut, as stated in paragraph 15, *supra*.

20.     On information and belief, soon after learning of Sgt. Mercer's transfer to a command position, Union President Matthews made multiple attempts to meet with State Police command staff to discuss Sgt. Mercer's transfer due to his nonmembership in the Union and/or his advocacy on behalf of the rights of nonmembers of the Union.

21.     In further attempts to express discontent with nonmember Sgt. Mercer's transfer, on or about June 22, 2015, Union President Matthews filed an institutional grievance over Sgt. Mercer's appointment.  The grievance claimed that Sgt. Mercer's appointment violated the Union and the State of Connecticut's collective bargaining agreement for the NP-1 bargaining unit ("CBA") because no selection process was used, as required by the contract.

22.     On information and belief, all of Sgt. Mercer's predecessors were appointed to the position of Operations Sergeant at the sole discretion of the commanding officer of Emergency Services, and did not go through a "selections process."  The Union never filed institutional grievances over the appointments of Sgt. Mercer's predecessors.  Unlike Sgt. Mercer, all of his predecessors were union members.

7

### October 2015 Barricaded Armed Suspect Incident

23.    On or about October 9, 2015, SWAT received a distress call from the local chief of police in Old Saybrook, Connecticut, seeking assistance with an armed suspect barricaded at a hotel.

24.    Executive Officer for Emergency Services, Lieutenant Ed Bednarz ("Lt. Bednarz"), was acting commander and Sgt. Mercer was co-commander of the SWAT response team. Once on the scene, Lt. Bednarz and Sgt. Mercer coordinated with the local police chief and State Police Central District Commander, Ed Gould, to handle the barricade situation.

25.    After communications with the suspect failed, Lt. Bednarz, Sgt. Mercer, and the other leadership devised an extraction plan. At the time the plan was devised, none of the acting state and local police leadership raised any objections to or questions or concerns about the plan.

26.    It is standard policy and practice that before a plan is implemented by SWAT or other Emergency Services divisions, those responsible for executing the plan, *i.e.*, the entry team, have the opportunity to voice concerns, objections, and/or propose alternative plans. In the past, there have been times where the original operation plan was altered based on feedback from the entry team.

27.    Pursuant to standard practice, the acting command staff for Emergency Services communicated the extraction plan to the SWAT team present. Those SWAT team

8

leaders and members were given an opportunity to raise questions, concerns, or propose alternatives to the plan, but no one did.  Everyone on the scene prior to the operation's execution approved the plan.

28.     During the operation's implementation, the barricaded suspect pointed a gun at one of the SWAT members, which resulted in two other SWAT members, Tfc. Dan McCarthy ("Tfc. D. McCarthy") and Tfc. C. Konow, shooting the suspect dead.  Tfc. D. McCarthy is a union member, but Tfc. C. Konow is not.

29.     It is standard SWAT practice that after carrying out an operation, those SWAT leaders and members involved informally discuss and review the operation, discuss areas that went well, and discuss areas for improvement.  On October 10, 2015, pending the response of State Police investigators to the incident, none of the SWAT leaders and members involved in the operation spoke negatively of the operation's plan or implementation nor raised questions, concerns, or proposed alternatives to the executed plan.

### Discrimination Against Union Nonmembers

30.     On information and belief, it is standard State Police practice and policy that when a state trooper is involved in a shooting incident, representatives from the Union and two State Police departments arrive on the scene shortly thereafter to consult with the trooper.  These representatives typically follow up with the trooper later on, as well.

9

31.     The State Police has two departments designed to help troopers involved in shooting incidents: the State Troopers Offering Peer Support ("STOPS") and the Employee Assistance Program ("EAP").  STOPS is staffed by personnel in the State Police NP-1 bargaining unit.  On information and belief, EAP is staffed by a private, third-party company.

32.     On or about October 10, 2015, within hours of the shooting, Lieutenant Colonel Warren Hyatt, Jr. ("Lt. Col. Hyatt") contacted Union President Matthews about the incident.  Other State Police officials contacted representatives for STOPS and EAP.

33.     After receiving a call from Lt. Col. Hyatt, Matthews responded to him, "Konow is not in the union, and McCarthy is no friend of the Union, so why would I call them?"

34.     Despite being contacted about the incident, and contrary to department policies and practice, no one from the Union, STOPS, or EAP showed up at the scene.  In all prior shooting incidents involving union members, representatives from those entities showed up at the scene to consult with the state troopers involved in the shooting.

### Invitation-Only Union Meetings

35.     Pursuant to the CBA, the Union and certain officials of the State Police regularly schedule labor-management committee meetings, the purpose of which is to discuss the CBA's application and other matters regarding the operation of the NP-1 bargaining unit.

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 Center Street • Manchester, CT 06040 • (860)646-5606 • Juris No. 107702

36.    On or about October 16, 2015, Union President Matthews and certain high ranking State Police officials held a labor-management committee meeting.  On information and belief, the meeting was originally scheduled to discuss body cameras for the state troopers.  Without prior notification to, or consent from, the other parties, Matthews, used the meeting to wrongly accuse Sgt. Mercer of "fixing" the selection process for new SWAT candidates.

37.    Contrary to Matthews' allegations, Sgt. Mercer did not "fix" the selections process.  On information and belief, Matthews knowingly made these accusations without verifying their accuracy.

38.    On or about October 16, 2015, Tfc. C. Konow officially began serving in the full-time SWAT position of Tactical Team Coordinator.  Maj. Darcy had appointed C. Konow to that position approximately two weeks earlier.  Prior to his transfer, C. Konow was employed full-time as a resident trooper within the State Police and part-time on SWAT.  Both positions are NP-1 bargaining unit positions represented by Defendant Union.

39.    The Tactical Team Coordinator is responsible for maintaining and conducting inventories over the Emergency Services division's armory, weaponry, and transportation vehicles; coordinating SWAT training; and assisting the Operations Sergeant and the Emergency Services Executive Officer with administering grants.

40.    The previous commander for Emergency Services created the position of Tactical Team Coordinator.  On information and belief, at the time the position was created

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 Center Street  ▪  Manchester, CT 06040  ▪  (860)646-5606  ▪  Juris No. 027702

and filled, a selections process was not used.  The Emergency Services commander simply appointed a state trooper to the position.

41.     On or about October 19, 2015, Defendant Union held a meeting at the union hall to which only select members of SWAT and certain high ranking State Police officials were invited.  None of the SWAT's union nonmembers were invited.

42.     During that meeting, Union President Matthews raised concerns about the tactical decisions made at the Old Saybrook shooting incident, which Sgt. Mercer co-supervised.  Prior to this shooting incident, on information and belief, the Union never had raised concerns or filed grievances over the handling of SWAT or other Emergency Services operations.

43.     During that meeting, Matthews also attacked the appointments of nonmembers Sgt. Mercer and Tfc. C. Konow to their respective full-time positions within Emergency Services, and the lack of a "selections process."  Matthews did not attack the appointments of Sgt. Mercer's and Tfc. C. Konow's predecessors to those same positions, even though they, like Sgt. Mercer and Tfc. C. Konow, did not go through a "selections process."  Sgt. Mercer's and Tfc. C. Konow's predecessors were union members.

44.     As a further display of the Union's animosity towards the nonmembers, on or about October 20, 2015, Walter Melfi, labor agent for the Union, filed an institutional grievance with the State for Tfc. C. Konow's appointment to the Tactical Team Coordinator position.  The Union did not file an institutional grievance against the appointment of Tfc. C.

12

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 Center Street • Manchester, CT 06040 • (860)646-5606 • Juris No. 07702

Konow's predecessor to the position.  Tfc. C. Konow's predecessor was a union member and a prior union president.

## Sgt. Mercer's Transfer

45.     On or about October 20, 2015, Sgt. Mercer was summoned to a meeting with Colonel Brian Meraviglia ("Col. Meraviglia"), and other high-ranking State Police officials to address the Union's statements at the October 16 and 19 meetings.

46.     During the October 20, meeting, Sgt. Mercer, along with Maj. Darcy and Lt. Bednarz, responded to the Union's statements made at the October 16 and 19 meetings, particularly as related to the Old Saybrook incident.  The command staff were satisfied with the responses, and expressed no concern or opposition to the matters discussed.

47.     On or about October 22, 2015, the Commissioner summoned Sgt. Mercer to an unplanned meeting.  During the meeting, the Commissioner indicated that the Union president threatened her with a press conference over certain issues regarding the Emergency Services division raised by the Union.  However, after Sgt. Mercer explained the tactical decisions made at the Old Saybrook incident, the Commissioner expressed her satisfaction.  The Commissioner also positively responded to the other matters discussed in the meeting.  Sgt. Mercer also informed the Commissioner about his lawsuit against the Union, his union membership resignation, and his advocacy on behalf of the rights of nonmembers of the Union.

13

48.     On or about October 25, 2015, Maj. Darcy informed Sgt. Mercer that the

Commissioner had requested, but not ordered, Col. Meragavilia and Lt. Col. Hyatt to

transfer him, as well as Maj. Darcy and Lt. Bednarz, out of Emergency Services.  Col.

Meragavilia and Lt. Col. Hyatt refused.

49.     On or about October 26, 2015, Union President Matthews held another Union

meeting at the Union hall.  Only certain SWAT members and the Commissioner were

invited.  No other State Police command staff were invited or present.

50.     After addressing the attendees generally, on information and belief, while

Union officers and SWAT union members were still present, Matthews and the

Commissioner went into a closed-door meeting.  About ten minutes later, Matthews came

out and announced to the attendees that "it was a done deal."

51.     On or about October 27, 2015, as a result of the closed-door meeting with

Matthews, the Commissioner verbally ordered that Sgt. Mercer be transferred from his

command position within Emergency Services.  Sgt. Mercer, a nonmember in the Union,

was the only individual the Commissioner ordered to be transferred.  The Commissioner

did not give any reason for Sgt. Mercer's transfer.

52.     On or about October 28, 2015, in a meeting with several State Police

command staff, Sgt. Mercer informed the attendees that the transfer was against his will.

The command staff informed him that his transfer was not because he had done anything

wrong.

14

53.     On or about October 30, 2015, Lt. Col. Hyatt, per the command of the

Commissioner, issued a written order confirming the Commissioner's verbal order that Sgt.

Mercer was to be transferred out of his full-time command position of Operations Sergeant

to a non-command position within the Office of Counter Terrorism. Although Sgt. Mercer's

transfer was not official until November 14, 2015, as of October 30, 2015, he was stripped

of all operational authority. No reason was provided for his involuntary transfer.

54.     On October 30, 2015, a written order was issued that Sgt. Kenneth Albert

("Sgt. Albert") was being transferred to the full-time position of Operations Sergeant within

Emergency Services. Like Sgt. Mercer, Albert did not go through a "selections process"

before being appointed to the position. Nevertheless, Defendant Union has not filed an

institutional grievance regarding Sgt. Albert's appointment. Sgt. Albert is a union member.

55.     On or about November 2, 2015, Sgt. Mercer submitted a request, through the

standard chain of command, to meet with the Commissioner regarding his job transfer.

56.     On or about November 16, 2015, the Commissioner denied Sgt. Mercer's

request in a letter stating that "the matter is under further review," without clarifying what

the "review" entails or the basis for his involuntary transfer.

57.     To date, Sgt. Mercer has received no reason or basis for his job transfer out

of his full-time position in Emergency Services. Nor has he received any disciplinary

action.

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 CENTER STREET • MANCHESTER, CT 06040 • (860)646-5606 • JURIS NO. 11702

## CSPU's Institutional Grievance

58.    In an attempt to create a pretext for Sgt. Mercer's transfer, on or about October 26, 2015, after the closed-door meeting with the Commissioner but before her order for Sgt. Mercer's transfer, Union President Matthews filed an institutional grievance against the handling of the Old Saybrook incident, which Sgt. Mercer co-supervised.  The grievance alleged both CBA and department procedure violations.

59.    It is standard practice that any violation of department procedures is filed through the State Police Internal Affairs, and not through an institutional grievance.

60.    Prior to his service as Operations Sergeant, Sgt. Mercer had supervised various operations calls.  Prior to the Union's grievance, Sgt. Mercer had received no disciplinary or other actions against him or his operations calls.

61.    Prior to the Union's institutional grievance involving Sgt. Mercer, on information and belief, the Union never has been involved in, voiced issues about, or filed grievances against any operations run or supervised by Emergency Services.  Prior to Sgt. Mercer's resignation from the Union, all Emergency Services unit command staff either had been union members in the unions representing NP-1 or the State Police Lieutenants and Captains (NP-9) bargaining units, or did not hold bargaining unit positions.

62.    On information and belief, it is standard practice in the State Police and Emergency Services that if the creation and execution of an operation created unnecessary risk to fellow troopers, the problem would be addressed at the earliest possible opportunity

16

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 CENTER STREET • MANCHESTER CT 06040 • (860) 646-5606 • FAX No. (06062

with possible alternatives to eliminate it from occurring again. Even though the Union filed a grievance, no one from the State Police or Emergency Services command staff has addressed the Old Saybrook incident as to what risk(s) should be avoided in the future. Neither has the Union attended any training sessions or attended other meetings with Emergency Services or SWAT to ensure that whatever risk(s) allegedly occurred be prevented from happening in the future.

63.     Moreover, on information and belief, the individuals in SWAT and Emergency Services who were present at the Old Saybrook incident and helped implement the operation, later gave sworn written statements that the operation went well.

**Sgt. Mercer's New Position**

64.     As set forth in paragraph 18, *supra*, the Operations Sergeant position is a prestigious command position within Emergency Services, and carries with it a great amount of supervisory responsibility, including: supervising all Emergency Services (including SWAT) operations; organizing training events; and coordinating security for high profile events. The Operations Sergeant also has administrative duties, including the application and administration of million dollar grants. Further, all of the position's potential overtime is pensionable.

65.     In contrast, the Office of Counter Terrorism is primarily administrative, with little to no supervisory responsibilities. In addition, there is little to no tactical operations or

17

other field work involved.  Sgt. Mercer's supervisory responsibilities and professional fulfillment are greatly diminished in his new position.

66.     Sgt. Mercer's base salary and benefits are the same at the new position based on the CBA's provisions for sergeants.  However, Sgt. Mercer's new position greatly diminishes his opportunity to work overtime and earn additional pay.  As Operations Sergeant, Sgt. Mercer generally worked 60 to 100 hours in overtime per month, and received approximately $50,000 to $60,000 in overtime pay annually, all of which could be considered part of Sgt. Mercer's salary in calculating his pension.

67.     In his position at the Office of Counter Terrorism, however, Sgt. Mercer may have the opportunity to work 5 to 20 hours of overtime per month, and make $10,000 to $15,000 in overtime pay, none of which can be counted as part of Sgt. Mercer's salary in calculating his pension.  Thus, Sgt. Mercer's transfer has a short- and long-term negative financial impact on him.

68.     Although Sgt. Mercer is still employed part-time on SWAT, the overtime opportunities are not as great compared to what they would be if he was assigned to SWAT full-time and in a supervisory position.

69.     At the time the Commissioner ordered Sgt. Mercer's transfer out of Operations Sergeant, Sgt. Mercer had been employed for approximately twenty-one years within the State Police, sixteen years in Emergency Services, and eleven years as

LAW OFFICES
BECK AND ELDERGILL, P.C.
447 Center Street • Manchester, CT 06040 • (860)646-5606 • Juris No. 02102

Sergeant.  At no time during his career had Sgt. Mercer received any warnings, reprimands, or other disciplinary actions.

## CLAIMS FOR RELIEF

70.    Plaintiff Sgt. Mercer repeats and realleges paragraphs 1 through 69 of this Complaint as if fully set forth herein.

71.    At all times relevant hereto, the First and Fourteenth Amendments to the United States Constitution guarantee Sgt. Mercer the freedoms of speech and association, which, among other things, include the right to refrain from or resign Union membership and the right to object to the payment of political and other non-bargaining union expenditures.  *See Ellis v. Bhd. of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 439 (1984); *Chicago Teachers Union v. Hudson,* 475 U.S. 292, 301-02 (1986).  At all times relevant hereto, Sgt. Mercer's freedom to exercise his constitutional rights without suffering retaliation through adverse employment action was protected by the First and Fourteenth Amendments to the United States Constitution.

72.    Beginning on or about November 11, 2014, and continuing through the present, Sgt. Mercer was and is engaged in constitutionally-protected activity by resigning Union membership, advocating for the rights of nonmembers of the Union, and objecting to the compulsory payment of the Union's political and non-bargaining expenses.

19

## COUNT I
### (Violation of 42 U.S.C. § 1983 and the United States Constitution)

73.     Plaintiff Sgt. Mercer repeats and realleges paragraphs 1 through 72 of this Complaint as if fully set forth herein

74.     Sgt. Mercer's First Amendment rights of speech and association were violated when he suffered an adverse employment action by Defendants, when, acting under color of state law, the Commissioner transferred him from his position as Operations Sergeant within Emergency Services to the Office of Counter Terrorism at the request of CSPU and/or Matthews. Sgt. Mercer's transfer greatly diminished his supervisory responsibilities, operational duties, and financial benefits. Sgt. Mercer also has suffered, and will continue to suffer mental, physical and emotional distress, damage to his personal and professional reputation, loss of enjoyment of life, and other losses.

75.     Sgt. Mercer's First Amendment rights of speech and association were violated when Defendant Commissioner transferred him at the request of Defendants CSPU and Matthews, and/or their agents, from his supervisory role in Emergency Services.

76.     At all times relevant hereto, Defendants were acting under color of state law.

77.     The Commissioner would not have transferred Sgt. Mercer in the absence of CSPU's and/or Union President Matthews' influence and Sgt. Mercer exercising his constitutionally protected speech and association to be a nonmember, to object to paying

20

Law Offices
Beck and Eldergill, P.C.
447 Center Street • Manchester, CT 06040 • (860)646-5606 • Juris No. 02702

for the Union's non-bargaining expenses, and/or to advocate on behalf of the rights of nonmembers.

78.     Defendants' actions and retaliation against Sgt. Mercer for exercising his First Amendment rights were done maliciously and intentionally, in that they were taken with the intent to injure Sgt. Mercer, and/or with reckless disregard for Sgt. Mercer's protected rights.

79.     As a result, Defendants, under color of state law, caused and subjected Sgt. Mercer to the deprivation of his rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments to the United States Constitution.

80.     As a result of the above described actions on the part of Defendants, Plaintiff Sgt. Mercer has suffered, and will continue to suffer, irreparable harm for which he has no adequate remedy at law, including the following:

(a)     injury by virtue of the actions of the Defendants described above, and can reasonably infer that he will be subject to further disciplinary and/or retaliatory action by Defendants as he continues to exercise his right to refrain from union membership and the payment of the union's political, ideological, and other non-bargaining activities; and

(b)     a chilling effect as a result of Defendants' actions described above, which may deter the exercise of First Amendment rights by Sgt. Mercer and others.

81.     Thus, as a direct result of Defendants' unlawful actions described herein, Sgt. Mercer:

21

(a)     is deprived of exercising his rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments to the United States Constitution without fear of discipline or retaliation;

(b)     is deprived of his civil rights guaranteed under the statutes of the United States; and

(c)     has suffered irreparable harm, damage, and injury for which there is no adequate remedy at law that is inherent in the violation of First Amendment rights.

## COUNT II
### (Violation of Conn. Gen. Stat. § 31-51q)

82.     Plaintiff Sgt. Mercer repeats and realleges paragraphs 1 through 81 of this Complaint as if fully set forth herein.

83.     Sgt. Mercer's actions involve the exercise of his freedom of speech and associational rights under the First and Fourteenth Amendments to the United States Constitution, and under Article 1, Sections 4 and 14 to the Constitution of the State of Connecticut.

84.     Defendants' actions of transferring Sgt. Mercer, or seeking his transfer, due to his nonmembership and/or objections to the payment of political and other non-bargaining expenditures, and/or advocacy on behalf of the rights of nonmembers, are violations of Sgt. Mercer's freedom of speech and association rights protected under the Constitutions of the United States and the State of Connecticut.

22

85.     Defendants Union and Matthews sought Sgt. Mercer's transfer, and Defendant Schriro transferred Sgt. Mercer from his command position of Operations Sergeant to the indefinite administrative position in the Office of Counter Terrorism, because of Sgt. Mercer's exercise of his rights guaranteed by the United States' and the State of Connecticut's Constitutions.

86.     Thus, Defendants retaliated against Sgt. Mercer for exercising his federal and state constitutional rights in violation of Connecticut General Statutes § 31-51q.

87.     Defendants' actions were intentional, willful and/or reckless; committed in total disregard for Sgt. Mercer's free speech and associational rights.

88.     As a result of Defendant Schriro's order for Sgt. Mercer's transfer, and Defendant Union and Matthews' seeking his transfer, all in violation of Connecticut General Statutes § 31-51q, Sgt. Mercer has suffered both economic losses and emotional distress.

## JURY TRIAL DEMAND

89.     Plaintiff Sgt. Mercer requests a jury trial on the issue(s) raised in the Claim for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays judgment as follows:

A.     Declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that the conduct Defendants engaged in violated Plaintiff's rights under the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983, and Article 1,

23

Sections 4 and 14 of the State of Connecticut Constitution, and Connecticut General Statutes Section 31-51q;

     B.     For injunctive relief, the Plaintiff asks this Court to grant a permanent injunction that:

     (i)     prohibits Defendants from retaliating against Sgt. Mercer for exercising his First Amendment rights; and

     (ii)     requires Commissioner Schriro to transfer Plaintiff back into the full-time position of Operations Sergeant.

     C.     Award Plaintiff compensatory damages and/or equitable relief, including restitution, and full payment of any potential overtime pay Sgt. Mercer would have received if he had he remained in his position as Operations Sergeant since on or about October 28, 2015, plus interest, and such other amounts as the principles of justice and compensation warrant.

     D.     Punitive Damages: Award Plaintiff punitive damages for Defendants' malicious, intentional, and/or reckless or callous indifference to Sgt. Mercer's constitutionally protected rights.

     E.     For nominal exemplary damages under 42 U.S.C. § 1983, plus interest, for depriving Plaintiff of his rights, privileges, and immunities secured by the Constitution of the United States.

24

F.      For costs, including reasonable attorneys' fees under 42 U.S.C. § 1988

and/or Connecticut General Statutes § 31-51q; and

G.      Such other and further relief as the Court may deem just and proper.

PLAINTIFF,

By: _____

    Marc P. Mercier, ct10886
    Beck & Eldergill, P.C.
    447 Center Street
    Manchester, CT 06040
    Tel:   (860) 646-5606
    Fax:   (860) 646-0054
    E-mail:  mmercier@beckeldergill.com


By:  /s/ _____

    Sarah E. Hartsfield
    c/o National Right to Work Legal
    Defense Foundation, Inc.
    8001 Braddock Road, Suite 600
    Springfield, Virginia  22151
    Tel:   (703) 321-8510
    Fax:   (703) 321-9319
    E-mail:  seh@nrtw.org

    *Pro hac vice admission pending*


Mercer\Pleadings\Comp02-16pld.wpd

25