## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH MERCER,<br><br>                    Plaintiff,<br><br>    v.<br><br>DORA B. SCHRIRO, COMMISSIONER OF THE DEPARTMENT OF EMERGENCY SERVICES AND PUBLIC PROTECTION, THE CONNECTICUT STATE POLICE UNION, INC., AND ANDREW MATTHEWS, PRESIDENT OF CONNECTICUT STATE POLICE UNION, INC.,<br><br>                    Defendants. | Civil Action No.<br>3: 16 - CV - 329  (CSH)<br><br><br><br><br>AUGUST 28, 2018 |

## RULING ON DEFENDANT DORA B. SCHRIRO'S MOTION TO DISMISS [Doc. 24] AND THE UNION DEFENDANTS' MOTION TO DISMISS [Doc. 36]

**Haight, Senior District Judge:**

## I.  INTRODUCTION

Plaintiff Joseph Mercer brought the instant civil rights action pursuant to  42 U.S.C. § 1983, against Dora B. Schriro, the Commissioner of his employer, the State of Connecticut Department of Emergency Services and Public Protection ("DESPP"); the Connecticut State Police Union, Inc. ("CSPU"); and Andrew Matthews, President of the CSPU.   Plaintiff is and was at all relevant times a sergeant with the State Police and alleges that he suffered an adverse employment action by all defendants in this action "when, acting under color of state law, the Commissioner transferred him from his position as Operations Sergeant with Emergency Services to the Office of Counter Terrorism at the request of the CSPU and/or Matthews."   Doc. 1, ¶ 7, ¶ 74.

In his Complaint, Plaintiff includes two Counts, which he asserts against all defendants. These Counts include: (1) "Violation of 42 U.S.C. § 1983 and the United States Constitution," alleging violations of Mercer's rights to free speech and association under color of state law, and (2) "Violation of Conn. Gen. Stat. § 31-51q," alleging a state statutory violation by infringing on Mercer's "exercise of his freedom of speech and associational rights under the First and Fourteenth Amendments to the United States Constitution, and under Article 1, Sections 4 and 14 to the Constitution of the State of Connecticut." Doc. 1, ¶¶ 73-81, 82-88.

In his "Prayer for Relief," Plaint requests declaratory judgment that his rights have been violated under the First and Fourteenth Amendments of the United States Constitution and under federal and state statutes, 42 U.S.C. § 1983 and Conn. Gen. Stat. § 31-51q. Doc. 1, Prayer for Relief, ¶ A. He also requests that the Court impose a permanent injunction: (1) prohibiting Defendants "from retaliating against [him] for exercising his First Amendment rights;" and (2) requiring the Commissioner to "transfer Plaintiff back into the full-time position of Operations Sergeant." *Id.*, ¶ B. In addition, Plaintiff seeks compensatory damages and/or equitable relief, including restitution and payment of overtime pay he would have received had he remained in his Operations Sergeant position after October 28, 2015. *Id.*, ¶ C. He also requests "punitive damages," stemming from Defendants' alleged "malicious, intentional, and/or reckless or callous indifference" to his constitutional rights. *Id.,* ¶ D. Finally, Plaintiff seeks "nominal exemplary damages under 42 U.S.C. § 1983, plus interest," and "costs, including reasonable attorneys' fees" under 42 U.S.C. § 1988 and/or Conn. Gen. Stat. § 31-51q. *Id.,* ¶¶ E.-F.

## A. Pending Motions

Pending before the Court are two motions to dismiss by the Defendants under Federal Rules

of Civil Procedure 12(b)(1) and 12(b)(6). The first motion is by Commissioner Dora R. Schriro (the "Commissioner"), asserting that Plaintiff's complaint should be dismissed in its entirety as to her because: (1) Plaintiff's claim under 42 U.S.C. § 1983 in Count One is "barred by the Eleventh Amendment (official capacity) and qualified immunity (individual capacity)," and (2) Plaintiff's claim under Conn. Gen. Stat. § 31-51q in Count Two fails to state a claim upon which relief may be granted. Doc. 24-1, at 1.

The second motion to dismiss was brought by defendants CSPU and Andrew Matthews (collectively herein the "Union Defendants"), arguing that Plaintiff's Complaint should be dismissed in its entirety against them because: (1) the claim under 42 U.S.C. § 1983 in Count One fails to establish that the Union Defendants acted under color of state law and "otherwise fails to state a claim upon which relief can be granted"; and (2) Plaintiff's state law claim under Conn. Gen. Stat. § 31-51q in Count Two fails to state a claim upon which relief may be granted. Doc. 36, at 1. The Court resolves both motions to dismiss in this Ruling.

**B. Factual Background**

The following facts are taken from the allegations contained in Plaintiff's Complaint. Both the Commissioner and the Union Defendants admittedly "dispute many of these 'facts,'" including attributions of motive to them. Doc. 24-1, at 1; Doc. 36-1, at 1. However, as set forth *infra*, for the purpose of ruling on a Rule 12(b)(1) and/or (b)(6) motion, the Court must accept as true all well-pled factual allegations in the complaint.

Plaintiff Joseph Mercer brought this civil rights action pursuant to 42 U.S.C. § 1983 against his employer, the State of Connecticut Department of Emergency Services and Public Protection ("DESPP"). He is and was at all relevant times a sergeant with the State Police. Doc. 1, ¶ 7.

Dora B. Schriro is the Commissioner of the DESPP and its commanding officer. *Id.*, ¶8. She is "responsible for developing policies, enforcing and executing all rules and regulations, and overseeing the general supervision of all the various departments, offices, and units within the DESPP and the State Police division." *Id.* She is sued in both her official and individual capacities. *Id.*

Plaintiff alleges that on November 14, 2014, he resigned his membership in the CSPU (herein the "Union"). *Id.*, ¶ 11. At various times since November 2014, Plaintiff informed his coworkers of their right to resign from the Union. *Id.*, ¶ 12.

At the time he resigned his Union membership, Plaintiff was "employed full time as a resident State Police Trooper for Colchester, Connecticut," who "supervised the daily operations of the local police department, comprised of twelve municipal police officers." *Id.*, ¶ 15. In addition to this full-time position, Plaintiff was employed part-time in the State Police Tactical Unit ("SWAT"), which is part of the Emergency Services division within the State Police. *Id.*, ¶ 16. Both of these positions are in the NP-1 bargaining unit represented by the Union.

Thereafter, on March 14, 2015, Plaintiff and three other former Union members filed a civil rights lawsuit against the Union and various Connecticut state officials for violating their First Amendment rights. *Id.*, ¶ 13.[1] He alleges that this lawsuit was "publicized in several local news media." *Id.*

On April 30, 2015, Major Mike Darcy, the senior commanding officer for Emergency Services, appointed Mercer to the full-time supervisory position of SWAT "Operations Sergeant,"

---

[1] *See Lamberty v. Connecticut State Police Union*, No. 3:15-cv-378 (VAB), Doc. 1 ("Verified Complaint," dated and filed on March 14, 2015).

4

*Id.*, ¶ 17. That transfer became effective on May 15, 2015. *Id*. Operations Sergeant is an NP-1 bargaining unit position. *Id.*

On June 22, 2015, Union President Andrew Matthews filed an institutional grievance regarding Plaintiff's appointment, claiming that the appointment violated the collective bargaining agreement ("CBA") between the Union and the State of Connecticut for the NP-1 bargaining unit because no selection process was used. *Id.*, ¶ 21. "[A]ll of Sgt. Mercer's predecessors were appointed to the position of Operations Sergeant at the sole discretion of the commanding officer of Emergency Services." *Id.*, ¶ 22. None of said predecessors went through a "selections process" but CSPU "never filed institutional grievances over [these] appointments." *Id.* Unlike Mercer, "all of his predecessors were union members." *Id.*

On October 9, 2015, SWAT received a distress call from the local police chief in Old Saybrook, Connecticut, seeking assistance with an armed suspect barricaded at a hotel. *Id.*, ¶ 23. Lieutenant Ed Bednarz, Executive Officer for Emergency Services, was the acting commander and Mercer was co-commander of the SWAT response team on that day. *Id.*, ¶ 24. Once at the scene, Bednarz and Mercer coordinated with the local police chief and State Police Central District Commander, Ed Gould, to handle the barricade situation. *Id.*, ¶ 24. Communicating with the armed suspect failed so Bednarz, Mercer, and the "other leadership devised an extraction plan." *Id.*, ¶ 25. All SWAT leaders and members on the scene prior to the operation's execution approved the plan. *Id.*, ¶ 27. When the plan was implemented, however, the barricaded suspect pointed a gun at one SWAT team member so two other SWAT team members shot the suspect dead. *Id.*, ¶ 28.

On or about October 16, 2015, pursuant to the CBA, Union President Matthews and certain high ranking State Police officials held a labor-management committee meeting. *Id.*, ¶ 36. Although

the meeting was "originally scheduled to discuss body cameras for the state troopers," Mathews used the meeting to accuse Mercer of "fixing" the selection process for new SWAT candidates. *Id.* Mercer alleges that such an accusation was false. *Id.*, ¶ 37.

A few days later, on October 19, 2015, the Union held a meeting at its hall with only select members of SWAT and certain high ranking State Police officials invited. *Id.*, ¶ 41. At the meeting, Matthews raised concerns about "the tactical decisions made at the Old Saybrook shooting [and fatality] incident," which Mercer had co-supervised.[2] *Id.*, ¶ 42. Matthews allegedly "also attacked the appointments of nonmembers Mercer and Konow to their respective full-time positions within Emergency Services.[3] *Id.*, ¶ 43. Matthews did not attack the appointments of Mercer's and Konow's predecessors to those same positions, even though they did not go through a "selections process." *Id.*

On October 20, 2015, Plaintiff Mercer was summoned to meet with Colonel Brian Meraviglia and other high-ranking State Police officials to address the Union's statements at the October 16 and 19 meetings, particularly those relating to the Old Saybrook incident. *Id.*, ¶¶ 45-46. According to Plaintiff, he responded to the Union's statements; and the "command staff were satisfied with the responses, and expressed no concern or opposition to the matters discussed." *Id.*, ¶ 46.

Two days later, on October 22, 2015, the Commissioner summoned Plaintiff to an unplanned

---

[2] "Prior to this shooting incident, on information and belief, the Union never had raised concerns or filed grievances over the handling of SWAT or other Emergency Services operations." Doc. 1, ¶ 42.

[3] C. Konow was one of the two SWAT team members who shot and fatally injured the suspect during the Old Saybrook incident. Doc. 1, ¶ 28. He was not, at all relevant times, a member of the Union. *Id.* In October of 2015, Konow was appointed by Major Darcy to the position of SWAT Tactical Team Coordinator, an NP-1 bargaining unit position. *Id.*, ¶ 38.

meeting where she "indicated that the Union president [Matthews] threatened her with a press conference . . . regarding the Emergency Services division raised by the Union." *Id.*, ¶ 47. Mercer then "explained the tactical decisions that were made at the Old Saybrook incident," to which the Commissioner allegedly "expressed her satisfaction." *Id.* Mercer and the Commissioner also discussed other matters to which the Commissioner responded "positively." *Id.* At the meeting, Plaintiff informed the Commissioner about his lawsuit against the Union, his resignation from Union membership, and his advocacy on behalf of the rights of non-members of the Union. *Id.*

On October 25, 2015, Major Darcy informed Mercer that the Commissioner requested (but did not order) that Colonel Meraviglia and Lieutenant Colonel Hyatt transfer Mercer, Major Darcy, and Lieutenant Bednarz out of SWAT. *Id.*, ¶ 48. Meraviglia and Hyatt allegedly refused to follow that request. *Id.*

On October 26, 2015, Union President Matthews held a Union meeting at the Union hall. *Id.*, ¶ 49. Only certain SWAT members and the Commissioner were invited. *Id.* After addressing the attendees generally, Matthews and the Commissioner left the general meeting to go into a closed-door session. *Id.*, ¶ 50. Ten minutes later, Matthews emerged and announced to the attendees that "it was a done deal." *Id.* "It" turned out to be the transfer of Mercer the following day. *Id.*, ¶ 51. In particular, the Commissioner verbally ordered Mercer to be transferred from his command position within SWAT, but gave no reason for the transfer. *Id.* Mercer, a non-member of the Union, "was the only individual the Commissioner ordered to be transferred." *Id.*, ¶¶ 51-53.

On the same day as the meeting, October 26, 2015, after the closed door session but before the Commissioner gave the order for Mercer's transfer, Union President Matthews filed an institutional grievance regarding the handling of the Old Saybrook incident, which Mercer had co-

supervised. *Id.*, ¶ 58. The grievance alleged both CBA and department procedure violations. *Id.* Other than this grievance, Mercer had never received a disciplinary action against him or his "operations calls." *Id.*, ¶ 60.

The next day after the transfer, October 28, 2015, in a meeting with several State Police command staff, Mercer "informed the attendees that the transfer was against his will." *Id.*, ¶ 52. The command staff told him that the "transfer was not because he had done anything wrong." *Id.*

On October 30, 2015, Lt. Col. Hyatt carried out the Commissioner's command to issue a written order confirming that Mercer had been transferred from his full-time command position in SWAT to a non-command position with the Office of Counter Terrorism. *Id.*, ¶ 53. The order included no reason for the transfer. *Id.* To date, no such reason has been provided.[4] *Id.*, ¶ 57.

On November 2, 2015, Mercer submitted a request to meet with the Commissioner regarding his job transfer. *Id.*, ¶ 55. Two weeks later, on November 16, 2015, she denied that request in a letter stating that "the matter is under further review." *Id.*, ¶ 56. The letter failed to explain what the review would entail or the basis for the transfer. *Id.* At the time of his transfer, Plaintiff had served for twenty-one years with the State Police, sixteen years in Emergency Services, and eleven years as Sergeant and"[a]t no time during his career had [he] received any warnings, reprimands, or other disciplinary actions." *Id.*, ¶ 69.

In his new position with the Office of Counter Terrorism, Mercer receives the same base salary and benefits that he received in his prior position "based on the CBA's provisions for

---

[4] Mercer also alleged that on October 30, 2015, a written order transferred Sergeant Kenneth Albert, a Union member, to "the full-time position of Operations Sergeant within Emergency Services." Doc. 1, ¶ 54. As with Mercer's prior appointment to that position, there had been no "selections process" before the appointment; but CSPU neither filed an institutional grievance nor complained to State Police Command Staff about [Albert's] appointment." *Id.*

sergeants." *Id.*, ¶ 66. However, in comparing his former position as SWAT Operations Sergeant with his current position in the Office of Counter Terrorism, Plaintiff alleges that Operations Sergeant was "a prestigious command position" with "a great amount of supervisory responsibility," whereas his present position with Counter Terrorism "is primarily administrative, with little to no supervisory responsibilities." *Id.*, ¶¶ 64-65. In addition, his "new position greatly diminishes his opportunity to work overtime and earn additional pay" (from 60 to 100 hours, versus 5 to 20 hours), which was considered part of his salary in calculating his pension. *Id.*, ¶ 66. Therefore, his "transfer has a short- and long-term negative financial impact on him." *Id.*, ¶ 67. As of the date this action commenced, Mercer was still employed part-time with SWAT, but the opportunity for overtime hours has not been as great as when he held a full-time, supervisory position. *Id.*, ¶ 68.

## II. DISCUSSION

### A. Standard for Review

Both motions to dismiss have been brought under Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The Second Circuit has stated that "the standards for dismissal under Rules 12(b((1) and 12(b)(6) [of the Federal Rules of Civil Procedure] are substantially identical," *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003) (citing *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999)) ("[T]he standards for reviewing dismissals granted under 12(b)(1) and 12(b)(6) are identical.")). However, as set forth below, there is a key distinction in that evidence outside the pleadings may, if necessary, be considered under Rule 12(b)(1), but not under 12(b)(6), unless the Court converts the motion into one for summary judgment. In the case at bar, no extraneous evidence has been presented.

**1.  <u>Dismissal Under Rule 12(b)(1), Fed. R. Civ. P. - Lack of Subject Matter Jurisdiction</u>**

Under Rule 12(b)(1), a district court must dismiss an action or claim for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 112 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citing *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (*per curiam*)). "[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon*, 752 F.3d at 243 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).  In that case, the "plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635 638 (2d Cir. 2005) (citation omitted).  *See also Makarova*, 201 F.3d at 113.  Although the court may "consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue," it "may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citations omitted).

**2.  <u>Dismissal Under Rule 12(b)(6), Fed. R. Civ. P. - Failure to State A Claim</u>**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of the complaint if that pleading fails "to state a claim upon which relief may be granted."  In order to survive such a motion, the complaint must comply with the standard set forth in the United States Supreme Court's seminal holding in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Under *Iqbal*,  the complaint

"must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)).[5] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

In determining whether the plaintiff has met this standard, the Court must accept the allegations in the complaint as true, draw all reasonable inferences and view all facts in the light most favorable to the non-moving party. *Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016), *cert. denied*, 137 S. Ct. 2279, 198 L. Ed. 2d 703 (2017). "[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dep't of Corr. Servs.,* 435 F.

---

[5] The Second Circuit has consistently adhered to the United States Supreme Court's plausibility standard set forth in *Iqbal*. *See, e.g., Giunta v. Dingman,* 893 F.3d 73, 79 (2d Cir. 2018); *Bd.-Tech Elec. Co. v. Eaton Corp.,* No. 17-3829-CV, __F. App'x__, 2018 WL 2901336, at *1 (2d Cir. June 11, 2018); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017).

App'x 52, 54 (2d Cir. 2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). In sum, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).[6]

## B. Commissioner

### 1. Count One - § 1983 Violation of First and Fourteenth Amendment Rights

In Count One, Plaintiff alleges that his "First Amendment rights of speech and association were violated when he suffered an adverse employment action by Defendants, when, acting under color of state law, the Commissioner transferred him from his position as Operations Sergeant within Emergency Services [SWAT] to [a position within] the Office of Counter Terrorism at the request of CSPU and/or Matthews." Doc. 1, ¶ 74. He also alleges that he was "deprived of exercising his rights, privileges, and immunities guaranteed by the First and Fourteenth Amendments of the United States Constitution without fear of discipline or retaliation." *Id.*, ¶ 81(a). The constitutional rights

---

[6] In general, in Ruling on a 12(b)(6) motion, the Court considers the pleadings and their attached exhibits. "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (quoting *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988)).

that the Defendants allegedly violated were Plaintiff's rights to "be a nonmember, to object to paying for the Union's non-bargaining expenses, and/or to advocate on behalf of the rights of nonmembers." *Id.*, at ¶ 77. According to Plaintiff, "Defendants were acting under color of state law." *Id.*, ¶ 75. Moreover, Sergeant Mercer's transfer "greatly diminished his supervisory responsibilities, operational duties, and financial benefits." *Id.*, ¶ 74. He allegedly suffered, and continues to suffer "mental, physical and emotional distress, damage to his personal and professional reputation, loss of enjoyment of life, and other losses." *Id.*

As to this Count, the Commissioner argues in her pending motion that the claims must be dismissed against her under the doctrine of qualified immunity. Doc. 24-1, at 7. Qualified immunity is "an immunity from suit rather than a mere defense to liability" and is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The Commissioner emphasizes that the "driving force" behind the doctrine is a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." Doc. 24-1, at 7 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987) (emphasis added)). In fact, the United States Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation," *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), so that until this "threshold immunity question is resolved, discovery should not be allowed," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Commissioner asserts that "it is clear from the facts pled that the individual capacity allegations of [her] wrongdoing . . . amount to an insubstantial claim to which qualified immunity must apply." Doc. 24-1, at 7.

### a. Standard Applicable to Commissioner's Motion

The Commissioner's submissions purport to weave the qualified immunity doctrine into the

tapestry of a motion under Rule 12(b)(1) to dismiss the complaint for "lack of subject-matter jurisdiction."  Plaintiff challenges the applicability of the Rule 12(b)(1) standard to the Commissioner's motion to dismiss.  Doc. 37, at 5.

Plaintiff contends that the Commissioner's qualified immunity defense "is not jurisdictional," but rather "a waivable affirmative defense," which is "properly raised under Rule 12(b)(6), not 12(b)(1)."  *Id.* (citing *Khudan v. Lee*, No. 12-CV-8147 RJS, 2015 WL 5544316, at *2 (S.D.N.Y. Sept. 17, 2015)).  Plaintiff therefore urges the Court to "reject the Commissioner's argument that it lacks subject matter jurisdiction under Rule 12(b)(1)."  *Id.*  I agree with Plaintiff on this point.

The doctrine of qualified immunity in civil rights cases frequently comes before the Second Circuit.  In *McKenna v. Wright*, 386 F.3d 432 (2d Cir. 2004), the Second Circuit said:

> Qualified immunity is an affirmative defense, and an affirmative defense is normally asserted in an answer. . . .
>
> . . . Nevertheless, we see no reason why even a traditional qualified immunity defense may not be asserted on a Rule 12(b)(6) motion as long as the defense is based on facts appearing on the face of the complaint. . . .
>
> Of course, a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route.

386 F.3d at 435-36 (internal citations omitted).  The qualified immunity defense "can be waived either by failure to raise it in a timely fashion or by failure to raise it with sufficient particularity."  *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (citation and internal quotation marks omitted).

These considerations may be contrasted with a lack of subject-matter jurisdiction, the element which informs a motion under Rule 12(b)(1).  The existence *vel non* of subject matter jurisdiction presents a fundamental issue; if subject matter jurisdiction is absent, no proceedings can take place

in the district court.  A qualified immunity defense has nothing to do with that.  Accordingly, there is no substance to the Commissioner's contention that the Court may lack subject-matter jurisdiction in this action due to the Commissioner's "qualified immunity defense."

### b.  Doctrine of Qualified Immunity - Individual Capacity

In consequence, the Court applies the Rule 12(b)(6) standard and examines the substance of the qualified immunity doctrine, as presented by the present motions.

Individual capacity suits "seek to impose individual liability upon a government officer for actions taken under color of state law."[7] *Hafer v. Melo*, 502 U.S. 21, 25 (1991).  "Thus, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Id.*  (citation and internal quotation marks omitted). Officials sued in their individual capacities may assert personal immunity defenses like qualified immunity.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982).

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.  *See also Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012); *Locurto v. Safir*, 264 F.3d 154, 162-63 (2d Cir. 2001).  "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Fabrikant*, 691 F.3d at 212 (citations and internal quotation marks omitted).

---

[7]  "Personal-capacity actions are sometimes referred to as individual-capacity actions." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

In general, to overcome the defense of qualified immunity, the right alleged to have been violated must be clearly established at a level of specificity such that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 638-39 (1987). In other words, the violation of plaintiff's rights must be so clear that no reasonable public official could have believed that his actions did not violate plaintiff's rights. *Anderson*, 483 U.S. at 640. *See also, e.g.*, *Cahill v. O'Donnell*, 7 F. Supp. 2d 341, 350 (S.D.N.Y. 1998). To determine whether qualified immunity bars a particular claim, the court must evaluate the basis of the defendant's conduct.

The Commissioner argues that she is entitled to qualified immunity for a number of reasons. First, she claims that there "was no clear constitutional violation" on the facts alleged. Doc. 24-1, at 10. In particular, she asserts that Plaintiff's First Amendment retaliation and Fourteenth Amendment claims "are premised upon a dispute between himself and his former Union over membership and payment of dues despite his resignation from the Union." *Id.*, at 10-11. She points out that "the lawsuit giving rise to this claim does not even include the Commissioner (or DESPP) as a defendant" so "it is not at all clear why the Commissioner would involve herself" in said lawsuit, let alone discriminate or retaliate against Mercer "for his position in a matter in which she has no stake in the outcome." *Id.*, at 11.

In addition, the Commissioner challenges whether, in any event, there could be a violation of a "clearly established constitutional right" where the Second Circuit has recently "acknowledged that 'management retaliation against a minority faction' in connection with 'intraunion dispute[s] . . . [that] merely involve internal union affairs,' may not qualify as matters of public concern" for purposes of the First Amendment. *Id.* (quoting *Lynch v. Ackley*, 811 F.3d 569, 582 n. 13 (2d Cir.

2016)).

Finally, the Commissioner questions whether union membership or, more specifically, the lack thereof, constitutes a protected class under the Fourteenth Amendment. The Court examines these arguments below.

### c. Violation of First and Fourteenth Amendments

Section 1983 creates a cause of action against any person who, acting under color of state law, abridges "rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 does not create substantive rights," but rather "provides a means to redress the deprivation of a federal right guaranteed elsewhere." *Diggs v. Town of Manchester*, 303 F. Supp. 2d 163, 182 (D. Conn. 2004). Put simply, "[v]iolations of rights thus give rise to § 1983 actions." *Shakhnes v. Berlin*, 689 F.3d 244, 250 (2d Cir. 2012).

### 1. First Amendment - Freedom of Speech

Plaintiff claims that when the Commissioner transferred him out of his position as [SWAT Operations Sergeant], she violated the "First Amendment and Fourteenth Amendments to the United States Constitution[, which] guarantee [him] the freedoms of speech and association," including, "among other things, . . . the right to refrain from or resign Union membership and the right to object to the payment of political and other non-bargaining union expenditures." Doc. 1, ¶ 71.

To establish that one was retaliated against in violation of the First Amendment, he [or she] must plausibly allege that "(1) his [or her] speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him [or her]; and (3) there was a causal connection between this adverse action and the protected speech." *Montero v. City of Yonkers, New York*, 890

F.3d 386, 394 (2d Cir. 2018) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011)). The first component requires a determination as to "whether the employee spoke as a citizen on a matter of public concern." *Montero*, 890 F.3d at 395. For speech to be protected by the First Amendment, it must be "on a matter of public concern," which includes speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). *See also Nagle v. Marron*, 663 F.3d 100, 106 (2d Cir. 2011).

"If the answer [to the public concern inquiry] is no," then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Montero*, 890 F.3d at 395 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). However, if the first component exists, the employer must show that it "had an adequate justification for treating the employee differently [based on his or her speech] from any other member of the general public." *Id.* (quoting *Garcetti*, 547 U.S. at 418).[8]

In considering whether a public employee is speaking as a citizen for First Amendment purposes, the key inquiry is whether that employee is speaking pursuant to his employment responsibilities. *Id.* at 395-96. When public employees make statements pursuant to their official duties, "the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 395 (citation and internal quotation marks omitted). *See also, e.g., Milardo v. Town of Westbrook*, 120 F. Supp. 3d 206, 216 (D. Conn. 2015) ("Under *Garcetti,* an employee's speech is not protected at all if she

---

[8] The Court notes that the First Amendment's protection of free speech applies to the States through the Fourteenth Amendment. *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964). Speech on issues of public concern are at the heart of such protection. *See, e.g., Piscottano v. Murphy*, 511 F.3d 247, 269 (2d Cir. 2007).

speaks in her capacity as a government employee instead of in her capacity as a citizen.").

Moreover, also relevant, but not fully determinative, is whether there is a "citizen analogue" – "a form or channel of discourse available to non-employee citizens." *Montero*, 890 F.3d at 393 (citation and internal quotation marks omitted). When a public employee speaks pursuant to his employment responsibilities, "there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 395 (citation and internal quotation marks omitted).

In the case at bar, the alleged speech was Mercer's "constitutionally protected speech and [freedom of ] association to be a nonmember [of the Union or CSPU], to object to paying for the Union's non-bargaining expenses, and/or to advocate on behalf of the rights of nonmembers." Doc. 1, ¶ 77. In particular, "[a]t various times since on or about November 14, 2014 [when Mercer resigned from the Union], [Plaintiff] informed coworkers of their rights to resign from the Union." *Id.*, ¶ 11. In addition, Plaintiff joined in filing a civil rights lawsuit against the Union and certain state officials for violating [his] First Amendment rights."[9] *Id.*, ¶ 13. This lawsuit was publicized in several local news media. *Id.* On or about October 27, 2015, after meeting with Union President Matthews, the Commissioner verbally ordered that Mercer be transferred from his command position with Emergency Services. *Id.*, ¶ 51. Plaintiff alleges that this transfer was against his will and he had done nothing wrong. *Id.*, ¶ 52. On the prior day, "[i]n an [alleged] attempt to create a pretext for [the] transfer," Matthews had "filed an institutional grievance against the handling of the Old Saybrook incident, which [Plaintiff] co-supervised." *Id.*, ¶ 58.

Analyzing Plaintiff's alleged speech, accepting the veracity of all well-pleaded factual allegations and interpreting them in his favor, Plaintiff's comments regarding resignation of his

---

[9] *See* n.1, *supra*.

union membership and advocacy for non-members, including the filing of a lawsuit against the Union, are speech on matters of public concern within the First Amendment. His speech was not part of his employment duties, nor part of a personal grievance about the terms and conditions of his employment. Rather, his speech related to a citizen's rights to resign from union membership, to associate with whom he wishes, and to pursue litigation relating to alleged union misconduct in the courts.[10]

The United States Supreme Court noted in *Knox v. Service Employees International Union, Local 1000*, 567 U.S. 298 (2012), that those who choose not to join unions possess the same First Amendment rights as union members to express their views:

> Public-sector unions have the right under the First Amendment to express their views on political and social issues without government interference. *See, e.g., Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010). *But employees who choose not to join a union have the same rights.* The First Amendment creates a forum in which all may seek, without hindrance or aid from the State, to move public opinion and achieve their political goals.

567 U.S. at 321-22 (emphasis added).

Most recently, the Supreme Court held in *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, 138 S. Ct. 2448, 2486 (2018), that "agency-shop arrangements, under which public-sector unions collect from non-members agency or 'fair share' fees, that is, a

---

[10] This is not to say that "all activities undertaken through a union necessarily become matters of public concern merely by virtue of their collateral connection to the union." *Lynch v. Ackley*, 811 F.3d 569, 582 (2d Cir. 2016). However, "retaliation solely for union activity clearly raises a public concern under *Connick* [*v. Myers*, 461 U.S. 128, 147 (1983)]." *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999).

proportionate share of union dues attributable to the union's activities as the collective-bargaining representative, violate the free speech rights of non-members by compelling them to subsidize private speech on matters of substantial public concern." 32 A.L.R. Fed. 3d Art. 1 (2018). The court in *Janus* stated:

> This procedure [of extracting 'fair share' fees from nonconsenting employees] violates the First Amendment and cannot continue. Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay. By agreeing to pay, nonmembers are waiving their First Amendment rights, and such a waiver cannot be presumed.

138 S. Ct. at 2486 .

In addition, under the First Amendment, a public employee may bring a "freedom of association" claim with respect to union membership. Specifically, the Second Circuit has held that "a public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." *Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (collecting cases). The right to choose not to associate with, or to resign from an organization, such as a union, invokes basic rights of freedom, a matter of public concern. "The right to associate freely is not mentioned in the text of the First Amendment, but has been derived over time as implicit in and supportive of the rights identified in that amendment." *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments, Appellate Div. of the Supreme Court of New York*, 852 F.3d 178, 185 (2d Cir. 2017).

In particular, the First Amendment includes the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000). *See also Sanitation & Recycling Indus.*, 107 F.3d 985, 996 (2d Cir. 1997) (the "associational freedom" of "expressive association" protects "the right of

individuals to associate for purposes of engaging in activities protected by the First Amendment, such as speech, assembly, the exercise of religion, or petitioning for the redress of grievances.").

Furthermore, the right to associate applies to choices regarding membership in associations, such as unions. *See, e.g., State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133 (2d Cir. 2013) ("Conditioning public employment on union membership, no less than on political association, inhibits protected association and interferes with government employees' freedom to associate."). "[T]he Second Circuit and courts within and outside of this Circuit have articulated their support of labor union activities as a component of the First Amendment's right to free association." *Murray v. Town of Stratford*, 996 F. Supp. 2d 90, 117 (D. Conn. 2014). *See also Wrobel v. Cnty. of Erie*, 211 F. App'x 71, 72 (2d Cir. 2007) ("Government employees who are not policymakers have the right not to affiliate with or support a particular party or faction as a condition of employment.") (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990); *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1287 (11th Cir. 2010) ("Just as '[t]he First Amendment clearly guarantees the right to join a union,' *Hobbs v. Hawkins*, 968 F.2d 471, 482 (5th Cir.1992), it 'presupposes a freedom not to associate' with a union, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984)".) (some lateral and internal citations omitted).

Finally, with respect to Plaintiff's prior filing of a federal action against the Union, an individual's right to file a legal action is at the core of free speech under the First Amendment. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 387 (2011) (quoting *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-897 (1984) and collecting cases).

In support of dismissal of this claim, Plaintiff argues that not all intra-union affairs are

matters of public concern, which she bases solely on footnote 13 in *Lynch v. Ackley*, 811 F.3d 569, 582 (2d Cir. 2016). In that footnote, the Second Circuit stated:

> It is not clear that speech by employees in the role of union officers, involving advocacy as to the terms and conditions of employment, fits comfortably into either category [*i.e.*, speech pursuant to official duties, which is ineligible for protection from retaliation, and speech "as a citizen"]. While such speech is not made pursuant to duties imposed by the employer, such speech is made pursuant to duties that arise from the employment relationship between management and the union membership – the duty of union officers is to represent the membership in advocacy and negotiation as to the terms and conditions of employment. Whether such speech belonged in the category of citizen speech, eligible for protection from retaliation, seems to us to have been unclear at the time of [defendant] Ackley's [allegedly retaliatory] actions.

*Lynch*, 811 F.3d at 582 n.13.

However, the court in *Lynch* also recognized that there may be situations where speech relating to union activity "seeks to communicate to the public or to advance a political or social point of view beyond the employment context," *Id.* at 582 (discussing *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999)). Under such circumstances, *e.g.*, "retaliation solely for union activity," protection from retaliation applies. *Id.* (quoting *Clue*, 179 F.3d at 61).

In the present case, Plaintiff's speech goes beyond intra-union affairs, extending to advocacy for non-members outside the union and to filing of a federal lawsuit. Under these circumstances, the Court concludes that Plaintiff's alleged "speech" addresses matters of public concern. That "speech" – relating to his resignation from the Union, advocacy for non-union members, and filing of a federal lawsuit against the Union – falls within the protection of the First Amendment. Plaintiff will be left to his proof to succeed on this claim against the Commissioner.

## 2. Fourteenth Amendment - Due Process

In her motion to dismiss, the Commissioner urges the Court to dismiss Plaintiff's Fourteenth

Amendment claim under § 1983 because "it is not clear that union membership or, more specifically, the lack thereof, constitutes a protected class under the Fourteenth Amendment." Doc. 24-1, at 11. Plaintiff responds with the explanation that his Fourteenth Amendment claim "need not be based upon his membership in a protected class to establish a retaliation claim." Doc. 37, at 18. In other words, rather than alleging unlawful discrimination, Plaintiff is alleging deprivation of a "liberty interest," which includes the right to free speech. *Id.* (citing *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) and *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 432-33 (S.D.N.Y. 2013)).

Because Plaintiff does not claim discrimination by the government as a class-based decision, the Court need not address a particular protected class under the Equal Protection Clause. In general, to state a claim for an Equal Protection due process violation, a plaintiff "must allege that a government actor intentionally discriminated against [him, for example,] on the basis of race, national origin or gender." *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 48 (2d Cir.1999). Alternatively, where a plaintiff does not allege that he is a member of one of these protected classes, an equal protection claim may be based on a "class of one" theory. However, *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008), eliminated class-of-one claims for government employees, such as Mercer, holding such claims to be unavailable as a matter of law when the government makes discretionary decisions concerning government employment. 553 U.S. at 606-07.

In Mercer's case, viewing Plaintiff's Fourteenth Amendment claim as one addressing a liberty interest (*i.e.,* freedom of speech and association), that claim may proceed. The Commissioner's motion to dismiss the Fourteenth Amendment component of Plaintiff § 1983 claim is based entirely on a discrimination, class-based theory which is inapposite to Plaintiff's asserted "liberty interest" claim. That liberty interest claim will survive the Commissioner's instant motion. *See, e.g., Vaher*

*v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 432-33 (S.D.N.Y. 2013) (allowing Fourteenth Amendment liberty interest claim to proceed, finding that "[t]his broad concept of liberty includes the right to free speech")*; Williams v. Walter Ford*, No. 3:14-CV-1181 (VAB), 2015 WL 8490910, at \*6 (D. Conn. Dec. 10, 2015) (recognizing that "[t]he range of liberty interests protected by the Fourteenth Amendment includes the right to free speech" and permitting Fourteenth Amendment due process claim to proceed ) (citing, *inter alia*, *Procunier v. Martinez*, 416 U.S. 396, 418 (1974)). *See also Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) ("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

### 3. <u>Timeline - Causation</u>

The Commissioner has stated that she is entitled to qualified immunity because "her actions were objectively reasonable under the circumstances." Doc. 24-1, at 12. Specifically, she asserts that the Plaintiff's factual timeline destroys the possibility that he has pled a viable First or Fourteenth Amendment claim. Doc. 24-1, at 12-13, 19. In her argument, the Commissioner asserts that Plaintiff's alleged activities regarding free speech (resignation from the Union, advocacy for non-members of the Union, and lawsuit) occurred before he was promoted to the position of SWAT Operations Sergeant. Therefore, "[e]ven assuming that the plaintiff's speech and/or actions at issue somehow were protected, and assuming further that plaintiff suffered an adverse employment action here, plaintiff has utterly failed to allege any plausible causal connection whatsoever between his supposedly protected speech/activities, and his transfer." *Id.*, at 19.

The Court disagrees with the Commissioner's conclusions regarding causation and the

plausibility of Plaintiff's underlying First and Fourteenth Amendment claims. Accepting the Plaintiff's factual allegations, as I must, it was Major Mike Darcy, the senior commanding officer for Emergency Services, who appointed Mercer to the full-time supervisory position of Operations Sergeant on or about April 30, 2015. This appointment was deemed effective on or about May 15, 2015. Major Darcy is not a defendant in this action. Although the promotion occurred approximately five months after Plaintiff resigned his membership in the Union (in November 2014), there is no indication that the Commissioner was involved in the promotion or that she even knew of Plaintiff's resignation from the Union at that time.

According to Plaintiff, October 22, 2015, was the date upon which the Commissioner was informed by Mercer that he had resigned from the Union, advocated on behalf of the rights of nonmembers of the Union, and filed a lawsuit against the Union. Doc. 1, ¶ 47. *See also* Doc. 37, at 17 ("[T]he Commissioner did not learn of Mercer's nonmembership until October 22, 2015.").[11]

---

[11] The Commissioner counters, alleging that she "knowingly permitted plaintiff's appointment into a full-time supervisory role within SWAT well **after** [the Plaintiff's] highly publicized lawsuit." Doc. 43, at 5 (emphasis in original). She also states in her reply memorandum that she "was aware of plaintiff's union dispute at the time she appointed him to the SWAT Operations full-time role on 4/30/15." *Id.*, at 6. The date upon which the Commissioner learned of Plaintiff's resignation from the Union, and/or lawsuit against it, may be in dispute but the facts alleged in the Complaint are the Court's focus on a motion to dismiss under Rule 12(b)(6). The assertions of counsel in a reply memorandum are not evidence and not properly subject to the Court's determination on the pending motions.

The Court also notes that the Commissioner's reply memorandum includes an argument regarding the "same actor inference." Doc. 43, at 6. This argument was neither presented in the original motion to dismiss nor mentioned in the Plaintiff's response to the motion so the Court may not consider it upon reply. "[R]eply papers may properly address new material issues raised in the opposition papers so as to avoid giving unfair advantage to the answering party," *Bayway Ref. Co. v. Oxygenated Mktg. & Trading*, 215 F.3d 219, 226-27 (2d Cir. 2000) (citation omitted); but "[a]rguments may not be made for the first time in a reply brief," *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir.1993). *See also* D. Conn. L. Civ. R. 7(d) ("A reply memorandum must be strictly confined to a discussion of matters raised by, and must contain references to the pages of, the

Therefore, the fact that Mercer was promoted after the alleged protected speech and association with nonmembers does not negate the allegations that the Commissioner transferred him on October 27, 2015, after meeting with Union President Matthews, in retaliation against Mercer's resignation from the Union and continuing advocacy against it. Doc. 1, ¶ 51.[12]   In discovery, the facts regarding causation and/or the Commissioner's motive in making the transfer may be developed.  On the face of the Complaint, the Court cannot conclude that causation does not and cannot exist.[13]   On a motion to dismiss, "[i]t is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred." *Soundview Associates v. Town of Riverhead*, 725 F. Supp. 2d 320, 340 (E.D.N.Y. 2010) (citing *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994)).

"Temporal proximity of the adverse action to the protected activity is a key indicator of

---

memorandum to which it replies."). *See also N.L.R.B. v. Star Color Plate Serv.*, 843 F.2d 1507 (2d Cir.1988) (rejecting party's attempt "to raise [an issue] for the first time in [a] reply brief" because the "failure to present this claim in [the] original brief" provided a ground for the court's "refusal to hear this claim.").

Nonetheless, had this "same actor" argument been presented in the motion to dismiss, the Court would have found it unpersuasive in that the Commissioner's view of the Plaintiff is alleged to have changed between his appointment and his transfer – *i.e.*, upon the Commissioner's discovery of his resignation from the Union and advocacy for nonmembers.

[12]  *See also* Doc. 1, ¶ 21 ( "[T]o express discontent with nonmember Sgt. Mercer's transfer, on or about June 22, 2015, Union President Matthews filed an institutional grievance over Sgt. Mercer's appointment," alleging that "Mercer's appointment violated the Union and the State of Connecticut's collective bargaining agreement for the NP-1 bargaining unit ("CBA") because no selection process was used, as required by the contract.").

[13]  The Commissioner makes much of the fact that on June 22, 2015, the Union grieved Plaintiff's full-time SWAT appointment, but she did not transfer him at the time.  Doc. 24-1, at 12-13.  Rather, she left him "undisturbed in his command role for several additional months."  *Id.*  However, the fact that the Commissioner failed to transfer Plaintiff immediately after the Union's first complaint does not prove that she did not later agree to transfer him for his non-union activities, perhaps after the Union made its point more forcefully during the October 26, 2015 meeting.  Discovery must yield the facts necessary for the Commissioner to prove her argument as to causation.  At this point, the Court must accept the well-pled factual allegations of the Complaint.

retaliation[;]" however, "[t]he operative issue is not simply the length of time between the protected activity and the alleged retaliation but the demonstrated nexus between the two." *Murray v. Town of Stratford*, 996 F. Supp. 2d 90, 121-22 (D. Conn. 2014) (quoting *Lomotey v. Connecticut Dep't of Transp.*, No. CIV. 3:05CV1711(PCD), 2009 WL 82501, at *11 (D. Conn. Jan. 12, 2009), *aff'd sub nom. Lomotey v. Connecticut-Dep't of Transp.*, 355 F. App'x 478 (2d Cir. 2009)). "In this Circuit, an inference of causation is defeated (1) if the allegedly retaliatory [action] took place at a temporal remove from the protected activity; or (2) if there was an intervening causal event . . . ." *Murray*, 996 F. Supp. 2d at 122 (quoting *Yarde v. Good Samaritan Hosp.*, 360 F.Supp.2d 552, 562 (S.D.N.Y. 2005)).

In the present action, there is less than one year between the protected activities and the retaliatory action. Although there are eleven and one-half months between Plaintiff's resignation from the Union (November 14, 2014) and the Commissioner's transfer of Plaintiff out of his SWAT Operations Supervisor position (October 27, 2015), there are only five days from the date the Commissioner allegedly learned that Plaintiff had resigned from the Union (October 22, 2015) and the transfer; and there is only one day between the closed-door meeting between the Commissioner and Matthews (on October 26, 2015) and the transfer.

Granted, Plaintiff was promoted to that SWAT position (effective May 15, 2015) during the one year period after Plaintiff's resignation from the Union, but there are no allegations that the Commissioner personally directed Darcy to select Plaintiff for the promotion to Operations Sergeant of SWAT. In contrast, the allegations in the Complaint specify that on October 22, 2015, the Commissioner first learned of Plaintiff's resignation from the Union. Doc. 1, ¶ 47. Five days later, on October 27, 2015, "the Commissioner verbally ordered that Sgt. Mercer be transferred from his

command position within Emergency Services." *Id.*, ¶ 51.

Furthermore, the nexus between the protected activity and the alleged retaliation may be further proven by Union President Matthews's October 26, 2015, meeting with the Commissioner, which resulted in Plaintiff's transfer the following day. All in all, the timeline set forth in Plaintiff's allegations does not destroy, but rather bolsters, the possibility of causation.[14]

Alternatively, Plaintiff argues that even if she had removed Plaintiff from his position of SWAT leadership to prevent his speech on a matter of public concern, she had an "overriding interest" to do so because the Union's "threatened press conference had the potential simultaneously to degrade the public's confidence in DESPP in general (and SWAT in particular), and to exacerbate an existing lack of confidence in plaintiff's leadership." Doc. 24-1, at 13-14 (citing *Duke v. Hamil*, 997 F. Supp. 2d 1291, 1301 (N.D. Ga. 2014) for proposition that "police officer's off duty, private display of controversial symbol, accompanied by publication of personal political [beliefs] on election of President Obama, [was] deemed appropriate grounds for demotion and transfer despite officer's First Amendment right to do so"). The Commissioner thus asserts that, under the test in *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563, 568 (1968), the test applied in *Duke*, she could " properly . . . take action, regardless of whether

---

[14] The Court notes that in discussing temporal proximity and causation, the court in *Murray* found that a period of eight to nine *years* between the plaintiff's filing of a lawsuit and the defendant's allegedly retaliatory conduct (of failure to hire) was "far too tenuous for [the] Court to find that there was a causal connection" between the two events. 996 F. Supp. 2d at 122. Moreover, in *Lomotey*, a period of several months failed to demonstrate causation, but that finding was in conjunction with "the lack of direct evidence suggestive of retaliation." 2009 WL 82501, at *12. In the present case, the period between Plaintiff's resignation from the Union (and/or filing of his lawsuit against the Union) and his transfer was at most eleven and one-half months. However, there are also intervening factual allegations suggestive of retaliation (*e.g.*, the Commissioner's meeting with Mercer on October 22, 2015, during which she allegedly learned of Plaintiff's resignation from the Union). Plaintiff will be left to his proof to establish causation.

plaintiff's Union issues constituted a matter of public concern, because she had an [overriding] interest in preventing the speech from impeding the [Police] Department's functions." Doc. 24-1, at 14 (citation and internal quotation marks omitted).

In *Pickering*, the United States Supreme Court held that "when a public employee speaks as a citizen on a matter of public concern, the employee's speech is protected unless 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern.'" *Harris v. Quinn*, 134 S.Ct. 2618, 2642 (2014) (quoting *Pickering*, 391 U.S. at 568). *See also Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2471 (2018).

However, Mercer's retaliation claim is also based on his First Amendment rights not to be a union member and to object to funding of union political expenses, which are subject to "strict scrutiny" so that the *Pickering* balancing standard does not apply. *See, e.g., State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 133 (2d Cir. 2013) ("Conditioning public employment on union membership, no less than on political association, inhibits protected association and interferes with government employees' freedom to associate. It is therefore subject to the same strict scrutiny, and may be done only "in the most compelling circumstances.") (quoting *Rutan v. Republican Party of Illinois*, 497 U.S. 62, (1990)).

In the case at bar, the Commissioner points to no facts in the Complaint to show that the transfer was done "in the most compelling circumstances." Rather, she simply states in conclusory fashion that she had an "overriding interest" in making the transfer and that the transfer was "objectively reasonable." Doc. 24-1, at 14. In sum, the Commissioner has failed to point to facts

in the pleadings to support the existence of the "most compelling circumstances" for the transfer. She merely makes assertions in her memorandum, which are not evidence and may not be considered in this matter.

Therefore, even if the transfer was appropriate under a "strict scrutiny" approach, the Court finds that, at the pleading stage, there is no evidence to support that argument.[15] On a Rule 12(b)(6) motion to dismiss, the Court assesses the legal sufficiency of the complaint, *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991), considering only the factual allegations therein, documents attached to that pleading as exhibits or incorporated by reference, matters of which judicial notice may be taken, and documents upon which Plaintiff relied in bringing suit. *Brass v. Am. Film Tech.*, Inc. 987 F.3d 142, 150 (2d Cir. 1993). The Court accepts as true and construes favorably the plaintiff's factual allegations in the complaint and the supporting documentation filed with it. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

At this point in the proceedings, there are no facts for the Court to make a determination that the Commissioner actually possessed the motive she alleges – to protect the functioning of the DESPP – when she transferred the Plaintiff from his leadership position in SWAT. Rather, based

---

[15] Moreover, even assuming *arguendo* that the *Pickering* balancing test were applicable, the Court could not presently consider facts outside the pleadings to assess the Commissioner's argument that her involuntary transfer of Plaintiff was "objectively reasonable." The *Pickering* test is a "fact-sensitive inquiry," *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 298 (E.D.N.Y. 2009); and matters outside the pleadings are not permitted on a motion to dismiss under Rule 12(b)(6). *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *see also, e.g., Shafir v. Continuum Health Partners, Inc.*, 57 F. Supp. 3d 325, 326 (S.D.N.Y. 2014) ("As the Second Circuit has noted, Rule 12(d) allows courts to 'direct[ ] a pretrial motion to the vehicle most appropriate for its resolution,' thereby 'ensuring that the motion is governed by the rule specifically designed for the fair resolution of the parties' competing interests at a particular stage of the litigation.'") (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).

on the Commissioner's alleged interactions with Union President Matthews immediately prior to her announced decision to transfer, the Commissioner may have had an ulterior, unconstitutional motive in effecting this transfer. Granted, time elapsed after the Plaintiff resigned his position in the Union, the filing of his lawsuit against the Union, and his appointment to the leadership of SWAT. However, at this stage of the proceedings, there is no evidence that this appointment was made at the Commissioner's behest, that the Commissioner knew of Plaintiff's resignation from the Union at the time of the appointment, or that the Commissioner could not have subsequently formed a retaliatory intent to transfer Mercer after the appointment.

In sum, based on the allegations in the Complaint, the Court cannot find as a matter of law that the Commissioner had alternative motives for the transfer, much less that her sole motive was to prevent the erosion of the public's confidence in DESPP and/or SWAT. At this time, on a Rule 12(b)(6) motion to dismiss, absent a supporting factual record, the Court finds that the Commissioner is not shielded from suit by "qualified immunity" via her arguments of lack of causation and/or the "reasonableness" of her decision to transfer Plaintiff.

The Complaint alleges that the Commissioner transferred Mercer out of his SWAT leadership position in retaliation for his opposition to the Union. If she did so, she could not have reasonably believed that her conduct would not violate Mercer's First Amendment rights. On the basis of the Complaint, the Court cannot find that she is entitled to qualified immunity at this time. As the factual record develops, she may be able to present the necessary proof to establish such a defense. *See, e.g., Cahill*, 7 F. Supp. 2d at 350 (due to minimal discovery, construing summary judgment motion as 12(b)(6) motion to dismiss and holding that Superintendent McMahon and Chief Inspector Fitzgerald of New York State Police were not entitled to qualified immunity where Plaintiff police

officers were allegedly transferred into unwanted positions and/or denied promotions and requested transfers as a result of their efforts to investigate and oppose corruption within the State Police). Count One may proceed against the Commissioner in her individual capacity for damages.

### d. Eleventh Amendment Immunity - Official Capacity Claim

In her motion to dismiss, the Commissioner asserts that "§ 1983 claims cannot be brought against any state entity or official capacity defendant because such claims are barred by the Eleventh Amendment to the U.S. Constitution." Doc. 24-1, at 15 (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979) and collecting cases).    The Court construes that statement as a request for dismissal of the § 1983 claim against her for damages in her official capacity.[16]

---

[16] The Commissioner states that she brought her motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), for "failure to state a claim upon which relief can be granted," because she believes that the law is currently "unclear in this Circuit" regarding "whether an Eleventh Amendment sovereign immunity barred claim technically must be dismissed under 12(b)(1) and/or 12(b)(6)." Doc. 24-1, at 5 and n.2. The Court need not decide whether Rule 12(b)(1) or 12(b)(6) is more properly the standard to dismiss a § 1983 claim against a state official in his official capacity for damages because in this case, the Court has not been presented with or considered any documents or evidence outside the pleadings, which would only be appropriate on a Rule 12(b)(1) motion or a Rule 56 motion for summary judgment. *See State Employees Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 (2d Cir. 2007) (noting that "[t]he distinction [between considering a motion under Rule 12(b)(1) and 12(b)(6)] is significant: while [the court] must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), we have held that, in adjudicating a motion to dismiss for lack of subject-matter jurisdiction, a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits.") (internal citation omitted).

However, the Court also notes that the Second Circuit has cited Rule 12(b)(1) when affirming the district court's holding that the Eleventh Amendment deprives the court of subject matter jurisdiction over an action. *Madden v. Vermont Supreme Court*, 8 F. App'x 128, 129 (2d Cir. 2001); *see also Goonewardena v. New York,* 475 F. Supp. 2d 310, 321 (S.D.N.Y. 2007) ("[W]hether or not sovereign immunity bars a claim [under the Eleventh Amendment] is properly decided under a rule 12(b)(1) motion" to dismiss for lack of subject matter jurisdiction.)(citing U.S. Const. Amend. XI; *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 73 (2000)).

The Eleventh Amendment immunity to which a state official is entitled in a § 1983 action depends on the capacity in which the official is sued – *i.e.*, whether that official is being sued in his or her official or individual capacity. *Hafer v. Melo*, 502 U.S. 21, 27 (1991). If a § 1983 suit against a state official in his or her *official* capacity seeks *money damages*, the state is deemed to be the real party in interest because an award of damages would be paid from the state treasury. *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 48-49 (1994). Under such circumstances, the action is deemed to be against the State so that the State official is entitled to Eleventh Amendment immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). *See also, e.g., Minotti v. Lensink*, 798 F.2d 607, 609 (2d Cir. 1986) ("[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.") (citing *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). Therefore, as to individual defendants acting in their official capacities, "the eleventh amendment immunity protects state officials sued for damages in their official capacity." *Minotti*, 798 F.2d at 609 (citing *Kentucky v. Graham*, 473 U.S. 159,169-70 (1985)) (emphasis added).

Furthermore, in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the United States Supreme Court explicitly held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Therefore, as to Plaintiff's suit against the Commissioner in her official capacity for damages and/or retrospective relief for a violation of federal law under section 1983, she is not a "person" subject to section 1983 liability. *See, e.g., Smith v. Martuscello*, 602 F. App'x 550, 551 (2d Cir. 2015) ("A suit against a state officer in his official capacity is, of course, a suit against the State. Because a governmental entity is liable under

§ 1983 only when the entity itself is a moving force behind the deprivation, in order for [the plaintiff] to have a viable claim against the Supervisory Defendants, he must allege a state 'policy or custom' [that] played a part in the violation of federal law.") (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (some citations and internal quotations omitted).

To the extent that the Plaintiff seeks *damages* against the Commissioner in her *official* capacity, as commanding officer of the DESPP, for a First or Fourteenth Amendment violation under § 1983, that claim is barred by the Eleventh Amendment and will be dismissed.

### e. Injunctive Relief

The Court notes that if Plaintiff succeeds in proving his § 1983 claim against the Commissioner, he seeks injunctive relief and declaratory relief, as well as damages. Under Count One, Plaintiff requests an injunction that "prohibits [her] from retaliating against [him] for exercising his First Amendment rights;" and "requires [her] to transfer [him] back into the full-time position of Operations Sergeant." Doc. 1, at 24 (Prayer for Relief, ¶ B.i.-ii.). Although Plaintiff's § 1983 claim is barred against the Commissioner in her official capacity for damages, that claim may proceed against her for injunctive relief.

In *Edelman v. Jordan*, 415 U.S. at 664 (1974 ), the United States Supreme Court held that the Eleventh Amendment does not bar an action against a state official for violation of federal law if the plaintiff seeks an injunction regarding that official's future conduct. *See also Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State.") (citing, *inter alia*, *Kentucky v. Graham,* 473 U.S., at 167, n. 14 (1985)); *Feng Li v. Rabner,* 643 F. App'x 57, 57-59 (2d

Cir. 2016) ("As to the individual defendants, generally, state officials are not immune under the Eleventh Amendment if the "complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." ) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645 (2002)) (internal quotation marks omitted).

Moreover, Plaintiff need not prove "personal involvement" of the Commissioner to succeed on such a claim. "[P]ersonal involvement of an official sued in his official capacity is not necessary where the plaintiff is seeking only injunctive or declaratory relief under 42 U.S.C. § 1983." *Glass v. Coughlin*, No. 91 Civ. 0193 (PKL), 1991 WL 102619, *2 (S.D.N.Y. May 29, 1991) (Leisure, *J*); *see also Project Release v. Prevost*, 463 F.Supp. 1033, 1036 (E.D.N.Y. 1978) ("While it is true that in this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983, the rule is limited to cases in which damages are sought and is plainly inapplicable where, as here, plaintiffs seek ... injunctive relief.") (internal citations omitted)). Rather, "[a]ctions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." *Marshall v. Switzer*, 900 F.Supp. 604, 615 (N.D.N.Y. 1995); *see also Koehl*, 85 F.3d at 89 (claim for injunctive relief in insufficient medical treatment action held proper where official had "overall responsibility to ensure that prisoners' basic needs were met."); *Schallop v. New York State Dept. of Law*, 20 F.Supp.2d 384, 391 (N.D.N.Y.1998) (claim for injunctive relief proper "where the state official has the authority to perform the required act").

In the case at bar, the Commissioner was responsible for transferring Mercer out of his SWAT command position and retains authority to transfer him back. Plaintiff's claim for injunctive

relief against the Commissioner in her official capacity may proceed.

## 2.   Count Two - Retaliatory Discipline or Discharge - Conn. Gen. Stat. § 31-51q

The Commissioner next argues that Count Two, arising under Conn. Gen. Stat. § 31-51q, must be dismissed against her as inapposite because Plaintiff has admitted that he "suffered no discipline or discharge." Doc. 24-1, at 20. Conn. Gen. Stat. § 31-51q creates a cause of action for violation of an employee's right to free speech under the United States and Connecticut Constitutions. The statute provides, in relevant part:

> Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to *discipline or discharge* on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages.

Conn. Gen. Stat. § 31-51q (emphasis added).

The Commissioner states that "[i]t is undisputed, and undisputable [sic], that plaintiff was neither 'disciplined' nor 'discharged' at any point relevant to these proceedings." Doc. 24-1, at 21. In support, she cites various paragraphs in the Complaint in which the Plaintiff repeatedly states that he was not disciplined. *Id.* (citing Doc. 1, ¶¶ 57, 60, 69). At paragraph 57, the Plaintiff alleges: "To date, Sgt. Mercer has received no reason or basis for his job transfer out of his full-time position in Emergency Services. Nor has he received any disciplinary action." In paragraph 60, Plaintiff alleges that "[p]rior to the Union's grievance, [he] had received no disciplinary or other actions against him or his operations calls." In paragraph 69, Plaintiff alleges that "[a]t no time during his career had [he] received any warnings, reprimands, or other disciplinary actions." The Commissioner thus

asserts that by his language in the Complaint, Plaintiff was not disciplined, much less discharged, by his employer when he was transferred.[17]

In *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455 (D. Conn. 2016), the court examined the terms "discipline or discharge," as those terms appear in § 31-51q, as follows:

> In perhaps the most thorough examination of the terms "discipline or discharge" in the context of section 31–51q, the Connecticut Superior Court held that "the language of § 31–51q, which . . . is restrictive even by Connecticut standards, simply cannot compare with the expansive texts of these asserted federal counterparts." *Bombalicki v. Pastore*, [No. 378772], 2000 WL 726839, at *5 (Conn. Super. Ct. May 10, 2000). Rather, under section 31–51q, the term "discipline" contemplates "an affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness." *See Burdick v. Clouet*, [No. CV085006062,] 2011 WL 2739557, at * 7 (Conn. Super, Ct. June 14, 2011) (citing *Bombalicki*, 2000 WL 726839, at *3).
>
> Examples of discipline include a change in an employee's salary or fringe benefits. *See id.* (holding that "transfer was not discipline" because transfer neither altered salary nor fringe benefits). A transfer will generally not be considered discipline if it results in no "loss of rank or base pay[.]" *D'Angelo v. McGoldrick*, [No. CV 93 0063904], 1995 WL 476843, at *4 (Conn. Super. Ct. [August 3,] 1995).[18] On the other hand, a transfer "to a position that is so objectively undesirable it could be considered a demotion" could qualify as discipline. *Matthews v. Dep't of Pub. Safety*, [No. HHDCV116019959S], 2013 WL 3306435, at *14 (Conn. Super. Ct. May 31, 2013) (*Matthews IV*). Unlike a mere withholding of a benefit, such as a denial of tenure, a transfer is an affirmative act that, under certain circumstances, has the ability to "diminish the happiness and status of an employee." *Id.*

211 F. Supp. 3d at 479 (D. Conn. 2016).[19]

On its face, the language of the Complaint suggests that Plaintiff was not "disciplined" by his employer, at least prior to the transfer. He alleges that "[t]o date, [he] has received no reason or

---

[17] Although the filing of a grievance by the Union may result in discipline by an employer, such a filing does not equate with discipline *by an employer*.

[18] *Aff'd*, 239 Conn. 356 (1996).

[19] *Aff'd in part, appeal dismissed in part sub nom. Brown v. Halpin*, 885 F.3d 111 (2d Cir. 2018).

basis for his job transfer out of his full-time position in Emergency Services. Nor has he received any disciplinary action." Doc. 1, ¶ 57. He also alleges that "[a]t no time during his career had [he] received any warnings, reprimands, or other disciplinary actions." Doc. 1, ¶ 69. In addition, Plaintiff concedes that his base salary has remained intact in his Counter Terrorism position. *Id.*, ¶ 66. ("Sgt. Mercer's base salary and benefits are the same at the new position based on the CBA's provisions for sergeants."). Viewing these allegations in isolation, one might conclude that Plaintiff was never disciplined or discharged by his employer, so that Count Two should be dismissed from this action for failing to allege facts to prove "discipline or discharge," an essential element under the statute.

However, Plaintiff also alleges that his "transfer greatly diminished his supervisory responsibilities, operational duties, and financial benefits." Doc. 1, ¶ 74. He has allegedly "suffered, and will continue to suffer mental, physical and emotional distress, damage to his personal and professional reputation, loss of enjoyment of life, and other losses." *Id.* In particular, while his former position as SWAT Operations Sergeant was "a prestigious command position" with "a great amount of supervisory responsibility," his present position with Counter Terrorism "is primarily administrative, with little to no supervisory responsibilities." *Id.*, ¶¶ 64-65. Moreover, his "new position greatly diminishes his opportunity to work overtime and earn additional pay" (from 60 to 100 hours, versus 5 to 20 hours), which was considered part of his salary in calculating his pension. *Id.*, ¶ 66. Therefore, his "transfer has a short- and long-term negative financial impact on him." *Id.*, ¶ 67. Plaintiff is clearly displeased with his transfer, views it as a demotion, and has suffered a financial impact.

Plaintiff's foregoing allegations may be interpreted as stating that, although he had not been

disciplined prior to the transfer and/or with a formal "disciplinary" notice, the October 2015 change

of position, although deemed a "transfer," actually resulted in a demotion in responsibility and a loss

of fringe benefits. Discussing the term "discipline" under § 31-51q, the Second Circuit recently

stated in *Brown v. Halpin*, 885 F.3d 111 (2d Cir. 2018):

> Although the word "discipline" is not statutorily defined, Connecticut courts
> have interpreted the term to "involve[ ] affirmative acts of punishment that (at least
> while the punishment is being inflicted) leave the recipients in a less happy state than
> that which they enjoyed before the punishment began." *Bombalicki v. Pastore*, No.
> 378772, 2000 WL 726839, at *3 (Conn. Super. Ct. May 10, 2000); *McIntyre v.
> Fairfield Univ.*, No. CV 020391471, 2003 WL 1090690, at *2 (Conn. Super. Ct.
> Mar. 3, 2003).

> We agree with the district court that Brown's allegation that the "transfer
> caused her a loss of benefits and prevented her from being eligible for a promotion"
> is sufficient to establish "an affirmative act of discipline under section 31–51q."
> *Brown*, 211 F.Supp.3d at 480 (internal quotation marks omitted). Brown's transfer
> did not merely maintain the status quo. *See Pastore*, 2000 WL 726839, at *1, 3-4
> (holding § 31–51q inapplicable to "employers who fail to promote employees");
> *McIntyre*, 2003 WL 1090690, at *2-3 (concluding that university had not
> "disciplined" plaintiff by denying tenure and declining to renew the plaintiff's
> time-limited employment contract). Brown instead alleges that because of the transfer
> she lost two credited years of service for the purpose of promotion. This is sufficient
> to constitute an act of "discipline" under § 31–51q.

885 F.3d at 118-19. *See also Bombalicki v. Pastore*, [No. 378772], 2000 WL 726839, at *5 (Conn.

Super. Ct. May 10, 2000) (Under section 31–51q, the term "discipline" contemplates "an affirmative

act of deprivation that diminishes the status or happiness of the recipient . . . .") (citation omitted).

Here, Plaintiff has clearly been left "in a less happy state" than the one he experienced as

Operations Supervisor of SWAT. His transfer goes beyond a failure to promote or the maintenance

of a status quo. Mercer is both displeased with his transfer, which moved him from a supervisory

to an administrative position, and he has lost benefits. In particular, his pension will not be as large

due to a decreased opportunity to work overtime hours. Under those circumstances, construing the

factual allegations in the Complaint in Plaintiff's favor, the Court considers that his transfer may be viewed as "discipline" under § 31-51q.

As an alternative basis for dismissal, the Commissioner argues that "Conn. Gen. Stat. § 31-51q is inapplicable because she is not plaintiff's employer." Doc. 24-1, at 21. She specifies that his claim "fails as a matter of law for yet another independently dispositive reason" – she is not an "employer" within the meaning of § 31-51q." *Id.*

This District and a number of Connecticut state courts have held that a supervisor or co-employee is not an "employer" under § 31-51q. *See Nyenhuis v. Metro. Dist. Comm'n*, 604 F. Supp. 2d 377, 384-85 (D. Conn. 2009) (granting motion to dismiss Conn. Gen. Stat. § 31-51q claim against sergeant supervisor and fellow police officer in West Hartford Police Department because these individuals were not employers of the plaintiff with respect to that claim).[20]

For example, in *Maisano v. Congregation Or Shalom*, No. NHCV074027175S, 2009 WL 415696 (Conn. Super. Ct. Jan. 26, 2009), the Connecticut Superior Court reasoned that if one applies the "axiom of statutory construction that legislative intent is to be determined by an analysis of the language actually used in the legislation," the logical result is "that § 31-51q should be interpreted exactly as it is written; namely that it only allows for liability against employers." 2009 WL 415696, at *3 (citing *Bridgeport Hosp. v. Comm'n on Human Rights & Opportunities,* 232 Conn. 91, 101 (1995)). "By its plain terms, this statutory language only applies to employers, and does not contain

---

[20] The Commissioner also points out that Title VII, a civil rights statute, has been repeatedly interpreted by the Second Circuit to apply only to the employer entity and not an official capacity defendant. Doc. 24-1, at 21 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1314 (2d Cir. 1995) (dismissing Title VII claims against three supervisors sued in their corporate and individual capacities)).

a clause establishing liability for other parties." *Id.* Therefore, despite "a dearth of appellate authority on this direct issue," the Connecticut Superior Courts have held that "[a] cause of action founded upon § 31-51q of the General Statutes . . . lie[s] only against a plaintiff's employer and not directly against an employer's agent." *Id.* (quoting *Laschever v. Journal Register Co.*, No. CV 94 0065372, 1994 WL 613427, at *6 (Conn. Super. Ct. Nov. 1, 1994)). Accordingly, in *Maisano*, where plaintiff employee of a synagogue brought a retaliatory discharge action under § 31-51q against the synagogue and its president, rabbi, treasurer, and a director who served on its board of directors, the court dismissed the action against each of the individual defendants. 2009 WL 415696, at *3. "[S]ince § 31-51q only allows for employer liability, counts two, three and four against the individual defendants [were] stricken." *Id. See also e.g,. Burdick v. Clouet*, No. CV085006062, 2011 WL 2739557, at *6 (Conn. Super. Ct. June 14, 2011) (holding that non-employer defendants are entitled to summary judgment on § 31-51q claims because "[a]s to the plaintiff's claim that Clouet violated § 31–51q, that statute does not provide for individual liability" [of non-employer]); *Ortega v. All-Star Transp., LLC*, No. AANCV095008684S, 2009 WL 5698079, at *3 (Conn. Super. Ct. Dec. 17, 2009) (holding that a managerial employee was not an employer under Conn. Gen. Stat. § 31-51t, the "drug testing" statute, and asserting that "[t]his conclusion is supported by other courts which have rejected the notion that a supervisor is an employer under [§31-51q,] another portion of the General Statutes concerning employee protection, Title 31, Chapter 557 Part II, the same part in which the workplace drug testing statute is found") (collecting cases).

Although Plaintiff may have been disciplined by his transfer under § 31-51q, Count Two against the Commissioner will be dismissed because she was an individual supervisory employee,

not an "employer," under that statute.[21]

## C.  The Union Defendants

### 1.      Count One - § 1983 Violation of First and Fourteenth Amendment Rights

The Union Defendants allege that Plaintiff's § 1983 claim against them fails to state a plausible claim because "plaintiff did not plead facts that establish that the Union [D]efendants – both of which are sued as private parties – were state actors or acted 'under color of state law' in connection with any of the allegations in the Complaint." Doc. 36-1, at 6.  Actions under § 1983 are only permitted against state actors or those acting under "color of state law." *Rendell-Baker v. Kohn*, 457 U.S. 830, 835 (1982).  There  exists no remedy under § 1983 for "merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982)) (emphasis added).

### a.   Elements of § 1983 Claim

In order to plead a plausible claim under 42 U.S.C. § 1983, one must set forth facts to establish liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983.  The United States Supreme Court has said that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citation omitted).

---

[21]   The Court notes that Plaintiff did not address the Commissioner's arguments to dismiss Count Two in his opposing memorandum, Doc. 37.   In that memorandum, he thus did not address whether he was  disciplined and/or the proper scope of "employer" under Conn. Gen. Stat. § 31-51q. Through his silence, Mercer effectively waived the opportunity to assert an opposition regarding dismissal of Count Two.  *See* D. Conn. L. Civ. R. 7(a)2. ("Failure to submit a memorandum in opposition to a motion may be deemed sufficient cause to grant the motion, except where the pleadings provide sufficient grounds to deny the motion.").

A § 1983 action has "two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis v. Cnty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). As to the first element, state action, the United States Supreme Court has stated:

> To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State . . . or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor. State employment is generally sufficient to render the defendant a state actor. It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.

*West v. Atkins*, 487 U.S. 42, 49-50 (U.S. 1988) (citations, internal quotation marks, and some punctuation omitted).

### b. State Action

#### 1. Union Defendants' Argument

The United States Supreme Court devised three broad tests to determine whether a private party's actions constitute state action under § 1983. The Second Circuit has described these three tests, as follows:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test"). *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) (citations and internal quotation marks omitted). It is not enough, however, for a plaintiff to plead state involvement in "*some activity* of the institution alleged to have inflicted injury upon a plaintiff"; rather, the plaintiff must allege that the state was involved "with the *activity that caused the injury*" giving rise to the action. *Schlein v. Milford Hospital, Inc.*, 561 F.2d 427, 428 (2d Cir.1977) (internal quotation marks and citation omitted)

(emphases added); *see also United States v. Int'l Bhd. of Teamsters*, 941 F.2d 1292, 1296 (2d Cir.1991) ("The question is not whether the decision to *establish* the [private entity] was state action, but rather whether the [private entity]'s decision to *sanction* [plaintiffs] may be 'fairly attributable' to the [g]overnment." (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982))).

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257-58 (2d Cir. 2008).

Defendants assert that Plaintiff failed to allege sufficient facts to show that the Union Defendants acted "under color of law" or were otherwise "state actors" under any of the traditional tests. Specifically, the Union Defendants assert that there are no alleged facts to satisfy the compulsion and delegation theories. Plaintiff has pled no facts to indicate that the State exerted coercive power over the Union Defendants to cause them to act wrongfully. Doc. 36-1, at 7 (citing Doc. 1, at ¶¶ 46-47 (alleging that the Union threatened a press conference over issues with SWAT team, but that the State Police command staff and Commissioner Schriro were satisfied with plaintiff's rebuttal to the Union's position)). Nor did Plaintiff imply in any way that the State delegated a public function to the Union. Doc. 36-1, at 7.

The Union Defendants concede that the third test, the joint action test, "merits discussion." *Id.*, at 8. They state that there are "allegations that could most favorably be construed to support a joint action claim" because they allege that the "Union had several meetings with agents of the State and lodged complaints about issues with the Emergency Services Unit Tactical team (colloquially referred to as SWAT)." *Id.*, at 1 (citing Doc. 1, at ¶¶ 36, 41-43, 45, 47, 49-51, 58). However, the Union Defendants argue that such allegations are "insufficient to satisfy the third standard, the joint action test" under relevant case law. *Id.*, at 8. In support, they cite, *inter alia*, *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999), for the proposition that "complaints by [a] private party to the police that ultimately led to police action against the plaintiff did not

45

satisfy [the] joint conduct test for purposes of a Section 1983 claim." Doc. 36-1, at 8. The Union Defendants also cite *Spear v. West Hartford*, 954 F.2d 63, 68-69 (2d Cir. 1992) for the holding that "meetings were insufficient joint conduct to find that [a] private party acted under color of law." Doc. 36-1, at 8.

Under the "joint action" doctrine, a private actor may be found "to act 'under color of' state law for § 1983 purposes . . . [if the private party] is a willful participant in joint action with the State or its agents." *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). "The touchstone of joint action is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, No. 05-CV-7331 (NRB), 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir.1999)).

In order to establish "joint action," a plaintiff must show that "the private citizen and the state official shared a common unlawful goal; the true state actor and the jointly acting private party must agree to deprive the plaintiff of rights guaranteed by federal law." *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y.1996); *see also Burrell v. City of Mattoon*, 378 F.3d 642, 650 (7th Cir. 2004) (To prove joint action, a plaintiff must show that "both public and private actors share a common, unconstitutional goal.") (citation and internal quotation marks omitted). Thus, when a private actor takes an active role, jointly engaging in action with state actors, he will be found to be a state actor. *See, e.g., Lugar*, 457 U.S. at 942 (finding that supplier who sought prejudgment attachment of debtor's property was a state actor because it "invok[ed] the aid of state officials to take advantage of state-created attachment procedures"); *Dennis*, 449 U.S. at 27-28 (concluding that defendants who conspired with and participated in bribery with federal judge acted under color of state law).

46

Analyzing the issue of "joint action," the Court examines the cases put forward by the Union Defendants to argue that they are not "joint actors" as a matter of law. In *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268 (2d Cir. 1999), after returning a rental truck to Healey Car & Truck Leasing, Inc. ("Healey"), the plaintiff, Stewart Ginsberg, engaged in a verbal altercation with Healey's manager about whether Healey and Ginsberg had agreed that Ginsberg's automobile insurer would pay the rental fee for the leased truck. Healey asked Ginsberg to leave the showroom because his "vulgar language and hostile behavior" were disrupting Healey's business and disturbing its customers. 189 F.3d at 270. After Ginsberg left Healey's showroom, the manager phoned the local police to report the argument and payment dispute. The police officer dispatched to the leasing showroom thereafter went to the nearby gas station to find Ginsberg and asked him to return to the showroom to "straighten out the matter." *Id.* Ginsberg complied, but, upon arriving, resumed his argument with the leasing manager. The police officer intervened by telling Ginsberg that he "owe[d] [the leasing company] . . . the money for the rental" and that, if Ginsberg did not pay, he could be arrested for larceny." *Id.* When Ginsberg continued arguing in a loud voice, the police officer threatened to arrest him for breach of the peace. *Id.*

Ginsberg then wrote a check to Healey as payment, upon which he later stopped payment. Ginsberg sued both Healey Car & Truck Leasing, Inc. and the police officer, alleging that he was deprived of property without due process of law in violation of § 1983. In particular, Ginsberg alleged that the leasing company, acting under color of state law, was complicit in the deprivation.

The Second Circuit rejected Ginsberg's argument regarding Healey, holding that it did not become a joint participant in a state action merely by requesting police assistance and providing information that led to police action. 189 F.3d at 272. In so holding, the Second Circuit specified

that "[w]here, as here, a police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under Section 1983." *Id.*

*Ginsberg* may be distinguished from the present case by its factual context. In *Ginsberg*, a private citizen requested police assistance with respect to an alleged crime; and such a request does not equate with state action because a police officer exercises "independent judgment" in determining whether to take action against the alleged wrongdoer. *See also, e.g.*, *Betts v. Shearman*, 751 F.3d 78, 86 (2d Cir. 2014) (plaintiff failed to state a plausible claim of a common goal under Section 1983 where the defendant allegedly made false accusations to the police, resulting in the plaintiff's arrest); *Anilao v. Spota*, 774 F. Supp. 2d 457, 498 (E.D.N.Y. 2011) ("The provision of information to, or the summoning of, police officers is not sufficient to constitute joint action with state actors for purposes of § 1983, even if the information provided is false or results in the officers taking affirmative action.") (citing *Ginsberg*, 189 F.3d at 272). In Mercer's case, however, no police officer was given information about, or requested to act against, an alleged criminal perpetrator. No police officer was summoned to render assistance. Rather, the Union allegedly injected itself into the Commissioner's management of DESPP by meeting with her to effect a joint plan to transfer Plaintiff.

Similarly, the facts in *Spear v. West Hartford*, 954 F.2d 63 (2d Cir. 1992) are clearly distinguishable from those in the instant action. In *Spear*, plaintiffs John M. Spear, an editor, and the Spear Printing Company, a newspaper publisher, (collectively "Spear") published an editorial critical of the Town of West Hartford's police department in suppressing anti-abortion

demonstrations.[22]  The Town thereafter filed a racketeering (RICO) suit against Spear and others in an effort to prohibit illegal protest activities.  The RICO action alleged Spear and others conspired to interfere with civil rights.  Spear then  brought a § 1983 action against, *inter alia*,  the Town of West Hartford, its Town Manager, and Summit Women's Center West, a women's healthcare facility, alleging that the RICO lawsuit "violated [Spear's] First Amendment rights, causing 'fear, mental anguish and worry over any potential legal liability . . ., thereby causing a chilling effect,' and that the town and Summit acted in concert to violate Spear's constitutional rights." 954 F.2d at 65.

Defendants moved to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).   In the motion, the Town argued that the complaint failed to state a cause of action under section 1983; and Summit contended that, as a private organization, it was not acting under color of state law.  *Id*.  In ruling that Summit was not a state actor, the court focused on the sole meeting between the attorneys for the  private actor, Summit, and those for the Town, and concluded that the meeting did not result in any detrimental action toward plaintiff Spear.  Chief Judge Oakes of the Second Circuit, as he then was, wrote:

> A private defendant may be held liable only as "a willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).
>
> Spear alleged that Summit, a private entity, acted in concert with the town and its agents. That conclusory allegation does not suffice to state a section 1983 action against Summit. To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. . . . . The only joint conduct alleged in the present case was a meeting between attorneys for West

---

[22]  On April 4, 1989, an editorial written by John M. Spear, entitled "Northern Rednecks," appeared in the newspaper *Orange County Post*, criticizing the West Hartford Police Department's efforts to disband an anti-abortion demonstration at the Summit clinic. 954 F.2d at 65.

Hartford and for Summit. When the town and Summit later filed a joint complaint, Spear was not named as a defendant. Summit, in sum, did not act under color of law. Thus, the district court correctly dismissed Spear's claim against Summit.

*Id.* at 68-69 (some internal and lateral citations omitted).

In *Spear*, it wasn't the fact that a meeting was held that made the Court conclude that there was no joint conduct between the state and the private party. Rather, it was the fact that the joint amended complaint filed *after the meeting* did not name Spear as a defendant. There was thus no joint action to Spear's detriment.

In Mercer's case, however, there are allegations that the private entities acted in concert with the state actor to bring about a detriment to Mercer. The alleged closed-door meeting of October 26, 2015, between the Commissioner and Matthews was followed the next day by the Commissioner's verbal order that Mercer be transferred from his command position within Emergency Services. Doc. 1, ¶ 51. Consequently, the alleged act of retaliation followed directly after the joint meeting, thereby allegedly resulting from it. In sum, neither *Ginsberg* nor *Spear* prevent a finding that, at the pleading stage, the Union Defendants may have acted as joint participants under color of state law for purposes of Plaintiff's § 1983 claim.

## 2. **Plaintiff's argument**

Turning to Plaintiff's arguments to support a finding that the Union Defendants acted under color of state law, Plaintiff first cites *Young v. Suffolk County*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010). In that case, the court held that "[a] private actor may be considered to be acting under the color of state law for purposes of § 1983 if the private actor was 'a willful participant in joint activity with the State or its agents.'" 705 F. Supp. 2d at 195 (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)). Moreover, a private party engages in joint activity if it "conspires

with a state official to violate the plaintiff's constitutional rights." *Fisk v. Letterman*, 401 F. Supp. 2d 362, 378 (S.D.N.Y. 2005)).  If a plaintiff has sufficiently pled that joint activity exists between a private party and a government official or "that there was a conspiracy between the private party defendants" and the government official, the plaintiff "will have sufficiently alleged state action by the private party defendants." *Id.* (quoting *Young*, 705 F. Supp. 2d at 196).

As Plaintiff asserts, "[j]oint activity occurs when a government official's actions are due to the private party's directive, rather than the government official's own initiative." *See* Doc. 44, at 10 (citing *Young*, 705 F. Supp. 2d at 196).  "Although simply supplying information to a police officer or government official is not joint activity, '[w]hen the private actor takes a more active role, however, and jointly engages in action with state actors, he will be found to be a state actor.'" *Id.* (quoting *Young*, 705 F. Supp. 2d. at 196). Joint action occurs if a private party conspires with a government official to violate a plaintiff's constitutional rights.  *Id.,* at 10-11 (citing *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)).

As an alternative to the "joint action" theory, a plaintiff may demonstrate that a private party defendant engaged in "state action" by engaging in a conspiracy with state actors under § 1983. *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002).  In that instance, a  plaintiff must allege: "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello*, 292 F.3d at  324–25 (2d Cir. 2002) (citing *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.1999)).  Conclusory allegations that the defendant has engaged in a conspiracy will not suffice.  *Id.*  However, "[a]  plaintiff is not required to list the place and date of defendants['] meetings and the summary of their conversations when he pleads conspiracy;" rather "the pleadings

must present facts tending to show agreement and concerted action." *Fisk*, 401 F. Supp.2d at 376 (internal citations and quotation marks omitted).

In the present case, Plaintiff asserts that the private Union Defendants acted under "color of state law" by conspiring with the state to transfer him from his position in SWAT as Operations Sergeant. As Plaintiff summarizes, " [t]he Complaint alleges that the Union Defendants engaged in, and were successful, 'in a vindictive and retaliatory attempt' to punish Mercer's exercise of his constitutional rights by removing him from the influential command positon [sic] of Operations Sergeant within the Emergency Services Unit ("ESU") of the State Police." Doc. 44, at 12. Plaintiff also alleges that the Defendants were not, as they contend, merely attempting to express concerns about ESU operations, but took actions to "incit[e] the exercise of state authority" to retaliate against Plaintiff's exercise of his constitutional rights to free speech and association. *Id.*, at 12. *See, e.g.,* Doc. 1 (Complaint), ¶¶ 20-23, 43, 54 (alleging Union Defendants first attempted to incite the State Police authority to transfer Plaintiff from his SWAT leadership position shortly after his appointment – before the Old Saybrook fatality incident – asserting that there had been no selections process for the Operations Sergeant position, even though no such process had been employed in prior and subsequent appointments involving Union members); *id.*, ¶¶ 49-50 (Union Defendants held a union meeting on October 26, 2015 to which only the Commissioner was invited and the next day the Commissioner ordered Mercer to be removed from his position).

Overt activities showing the alleged conspiracy with the Commissioner include "the closed door meeting" on October 26, 2018, and Matthews's announcement after that meeting that "it was a done deal," implying that he reached an agreement with the Commissioner. Doc. 1, ¶¶ 50-51. Those acts were then followed by Matthews's alleged pretextual filing of "an institutional grievance

against [Plaintiff's] handling of the Old Saybrook incident" and the ultimate order by the Commissioner the next day to remove Mercer from his leadership position in SWAT. *Id.*, ¶¶ 51, 58.

At the pleading stage, Plaintiff has set forth a plausible claim that there was an agreement between the Union Defendants, acting by and through Union President Matthews, and the Commissioner of the State Police to remove Mercer from his Operations Sergeant position for exercising his First Amendment rights. Doc. 44, at 16. In addition, Plaintiff has alleged "concerted and overt acts" to prove an agreement was formed via the "closed door" meeting and carried out when the Commissioner ultimately ordered Mercer's transfer. Defendants' "institutional grievance," protesting the handling of the October 2015 Old Saybrook incident, allegedly provided a pretext for the unlawful motive behind Mercer's transfer. *Id.*, at 16-17 (citing Doc. 1, ¶¶ 51, 53, 58-63).

In sum, at the pleading stage, Plaintiff has set forth a plausible claim that the Union Defendants engaged in joint action, agreeing and/or conspiring with the Commissioner to remove Mercer from the SWAT Operations Sergeant position due to his resignation from the Union, objection to CSPU's nonchargeable expenses, advocacy on behalf of nonmembers, and lawsuit against the Union. His removal thereby violated his First Amendment right to be free from retaliation for exercising those rights and his Fourteenth Amendment liberty interest in freedom of speech .

### 3. **Defendants' Additional Argument**

In their memorandum in support of their motion to dismiss, the Union Defendants further attempt to claim they were not "state actors" under a "lack of delegation" theory. They argue that the alleged conduct "causing the deprivation of a federal right" can "be fairly attributable" to the State, in this case the DESPP. Doc. 36-1, at 10 (citing *Nat'l Collegiate Athletic Ass'n v. Tarkanian*,

488 U.S. 179, 199 (1988)). In the *Tarkanian* case, upon which they rely, college basketball coach Jerry Tarkanian, a public employee of the University of Nevada, Las Vegas ("UNLV"), a public university and thus state actor, was suspended by UNLV upon the recommendation of the National Collegiate Athletic Association ("NCAA"), an unincorporated association of 960 public and private universities and colleges. Tarkanian sued both UNLV, and ultimately the NCAA, for acting jointly with the UNLV to suspend and penalize him. *Id.* at 183. The question regarding the NCAA's participation was whether it was a state actor for purposes of imposing penalties on Tarkanian for alleged violations of NCAA rules. As the Supreme Court noted, "[t]he NCAA's Committee on Infractions conducts investigations, makes factual determinations, and is expressly authorized to impose penalties upon members [universities] that have violated the rules, but is not authorized to sanction a member institution's employees[, such as Tarkanian,] directly." *Id.* at 179.

The NCAA had investigated alleged violations of NCAA requirements by UNLV, including allegations concerning improper recruitment of student athletes by basketball coach Tarkanian. UNLV responded to the allegations by denying all of them and arguing that "Tarkanian was completely innocent of wrongdoing." *Id.* at 185. Thereafter, the NCAA's Committee on Infractions conducted four days of hearings at which "counsel for UNLV and Tarkanian presented their views of the facts and challenged the credibility of the NCAA investigators and their informants." *Id*. "Ultimately the Committee decided that many of the charges could not be supported, but it did find 38 violations of NCAA rules, including 10 committed by Tarkanian." *Id*. at 185-86. The "[m]ost serious" finding was that "Tarkanian had violated the University's obligation to provide full cooperation with the NCAA investigation." *Id.* at 186.

As a result of the investigation and hearing, the NCAA Committee proposed a series of

sanctions against UNLV, including a 2-year period of probation during which its basketball team would be prohibited from  participating in postseason games or television appearances.  *Id*.  The Committee also requested UNLV to "show cause why additional penalties should not be imposed against UNLV if it failed to discipline Tarkanian by removing him completely from the University's intercollegiate athletic program during the [delineated two-year]] probation period."  *Id.* Although UNLV appealed most of the Committee's findings and proposed sanctions to the NCAA Council, the Council ended up unanimously approving the Committee's investigation and adopting all its recommendations.  *Id.* The president of UNLV considered other options but  ultimately concluded that UNLV should  accept the proposed sanctions "given the terms of our adherence to the NCAA."  *Id.* at 186-87.

In his § 1983 action, Tarkanian had asserted "that the NCAA's investigation, enforcement proceedings, and consequent recommendations constituted state action because they resulted from a *delegation of power by UNLV*."  *Id.* at 195 (emphasis added).  The Court, however, found no such delegation of power and no agreement between UNLV and the NCAA with respect to the sanctions.  Key to that finding was the friction between the NCAA and UNLV regarding the suspension of Tarkanian.  Although the NCAA urged the suspension, UNLV steadfastly opposed it. UNLV and the NCAA acted as adversaries throughout the proceedings.[23]

_____

[23]  Moreover, NCAA's rules were not "state rules" and the NCAA was not a "state actor" because UNLV technically retained plenary power to withdraw from the NCAA.  Describing the NCAA's dealings with UNLV, Justice Stevens wrote for the majority:

> The express terms of the Confidential Report [by the NCAA Committee on Infractions regarding Tarkanian] did not demand the suspension unconditionally; rather, it requested "the University ... to show cause" why the NCAA should not impose additional penalties if UNLV declines to suspend Tarkanian. App. 180. Even the university's vice president acknowledged that the Report gave the university

In determining whether the NCAA's liability could be upheld for its participation in the events leading to Tarkanian's suspension as "state action" prohibited by the Fourteenth Amendment – "performed 'under color of' state law within the meaning of § 1983" – the Court clarified that "[i]n the final analysis the question is whether 'the conduct allegedly causing the deprivation of a federal right [can] be fairly attributable to the State."[24]   488 U.S. at 182, 199 (citation omitted).   As the *Tarkanian* Court summarized:

> Clearly UNLV's conduct was influenced by the rules and recommendations of the NCAA, the private party. But it was UNLV, the state entity, that actually suspended Tarkanian. Thus the question is not whether UNLV participated to a critical extent in the NCAA's activities, but whether UNLV's actions in compliance with the NCAA rules and recommendations turned the NCAA's conduct into state action.

488 U.S. at 193.   The Court concluded that UNLV's actions did not turn the NCAA's conduct into state action.

In addition to a lack of delegated state power, in *Tarkanian* there was clearly no "agreement" between the state entity, UNLV, and the private one, NCAA, to act against Tarkanian. The Court

----

options other than suspension: UNLV could have retained Tarkanian and risked additional sanctions, perhaps even expulsion from the NCAA, or it could have withdrawn voluntarily from the Association.

*Tarkanian*, 488 U.S. at 197-98.

[24]   The Court concluded that UNLV, as a state university,  was clearly a "state actor" under § 1983:

When [a state university] decides to impose a serious disciplinary sanction upon one of its tenured employees, it must comply with the terms of the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. Thus when UNLV notified Tarkanian that he was being separated from all relations with the university's basketball program, it acted under color of state law within the meaning of 42 U.S.C. § 1983.

*Tarkanian*, 488 U.S. at 192-93 (internal citations omitted).

noted that "the notion that UNLV's promise to cooperate in the NCAA enforcement proceedings was tantamount to a partnership agreement or the transfer of certain university powers to the NCAA is belied by the history of this case." *Id.* at 196. Instead, "[i]t is quite obvious that UNLV used its best efforts to retain its winning coach – a goal *diametrically opposed* to the NCAA's interest in ascertaining the truth of its investigators' reports." *Id.* (emphasis added). "During the several years that the NCAA investigated the alleged violations, the NCAA and UNLV acted much more like adversaries than like partners engaged in a dispassionate search for the truth." *Id.* It would, in fact "be ironic indeed to conclude that the NCAA's imposition of sanctions against UNLV – sanctions that UNLV and its counsel, including the Attorney General of Nevada, steadfastly opposed during protracted adversary proceedings – is fairly attributable to the State of Nevada. It would be more appropriate to conclude that UNLV has conducted its athletic program under color of the policies adopted by the NCAA, rather than that those policies were developed and enforced under color of Nevada law." *Id.* at 199.

In the instant case, as in *Tarkanian*, there are no allegations that the DESPP delegated any state powers to the Union Defendants. However, unlike in *Tarkanian*, Plaintiff alleges that the Union Defendants and the Commissioner were *in agreement* regarding the retaliatory transfer. *See*, *e.g.*, Doc. 1, ¶¶ 50-51 (upon emerging from his closed-door meeting with the Commissioner on October 26, 2015, Matthew announced that "it was a done deal"). No alleged facts suggest any friction or disagreement between them in this respect. Therefore, the allegation that the October 26 closed-door meeting was followed, without discord, by Mercer's transfer plausibly demonstrates an agreement between the Commissioner and Union Defendants, culminating in a jointly planned act to deprive Plaintiff of his constitutional rights to free speech and association. Rather than the State

taking action alone, the Union Defendants allegedly participated jointly in the decision to transfer Plaintiff under color of state law. *See, e.g., id.*, ¶ 77 ("The Commissioner would not have transferred Sgt. Mercer in the absence of CSPU's and/or Union President Matthews' influence . . . ."). Under these circumstances, at least at the pleading stage, Count One states a plausible claim against the Union Defendants as joint actors under color of state law under § 1983.

### 4. <u>Protected Rights and Causation</u>

The Union Defendants next focus on the substance of the underlying constitutional claims to argue that even if they were "state actors," Plaintiff has failed to plead the facts necessary to establish a viable First Amendment retaliation or Fourteenth Amendment due process claim. They state in their supporting memorandum: "Boiled down to its essence, plaintiff has not alleged sufficient factually relevant matter to comprise a viable claim under the First or Fourteenth Amendment." Doc. 36-1, at 14. In particular, "'the 'speech' at issue involved a faction group's fight with its union, and whether said union could continue to collect dues and/or fees from them notwithstanding the subsequent resignation of such faction members from the union." *Id.,* at 14-15. Here, the "situation" is neither "protected activity under the First Amendment," nor "does it fall within the ambit of the Fourteenth Amendment, as there is not even a protected class at issue here." *Id.* at 15.

Furthermore, the Union Defendants argue that even if Plaintiff's speech and/or actions with respect to the Union were constitutionally protected, he has failed to allege a causal connection between his speech and/or activities and his transfer. Like the Commissioner, they point to the timeline in the Complaint, emphasizing that Plaintiff was transferred into the full-time SWAT leadership role well after he resigned from the Union and after he filed his federal lawsuit against

58

the Union. In addition, the Union Defendants point out that Mercer was not relieved of command when the Union filed its first grievance concerning his assumption of Operations Sergeant position on June 22, 2015. Only after the SWAT shooting and fatality incident in Old Saybrook on October 9, 2015, did the Commissioner act to transfer Plaintiff. After that event, the Union repeatedly raised concerns regarding Plaintiff's leadership within SWAT during a series of meetings, threatened to hold a damaging press conference about the Emergency Services Unit, and filed a second institutional grievance regarding that incident. Doc. 36-1, at 15. According to the Union Defendants, the Commissioner did not transfer Plaintiff due to his resignation from, and/or lawsuit against, the Union. They thus conclude that Plaintiff has failed to plead the key element of causation to bring his claim for constitutional violations under § 1983.

As to whether Plaintiff's speech to non-union members and in filing his lawsuit were protected speech under the First Amendment, the Court has concluded that they were. *See* Part II.B.1.c.1. (captioned "First Amendment - Freedom of Speech"), *supra*. This protected speech includes speech "relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). *See also Nagle v. Marron*, 663 F.3d 100, 106 (2d Cir. 2011).

With respect to the Fourteenth Amendment, the Union Defendants make no detailed argument for dismissal of that claim under § 1983. However, as previously discussed herein, that alleged violation of Plaintiff's Fourteenth Amendment rights pertains to a liberty interest with respect to free speech, as opposed to any membership in a "protected class." The deprivation of a "liberty interest" includes the right to free speech. *See De Jonge v. Oregon*, 299 U.S. 353, 364 (1937); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 432-33 (S.D.N.Y. 2013)). *See* Part II.B.1.c.2.

(captioned "Fourteenth Amendment - Due Process"), *supra*.  For the reasons set forth previously in this Ruling, Plaintiff has alleged a  plausible  claim for violation of his Fourteenth Amendment rights  under § 1983.

Furthermore, as to causation and the timeline of alleged facts, the Court disagrees that no connection may be found between Plaintiff's protected speech and his transfer.  Granted, Plaintiff was appointed to his position as Operations Sergeant of the SWAT unit after he resigned his membership in the Union on November 14, 2014, and filed a lawsuit against it on March 14, 2015. However, he was promoted to Operations Sergeant  by Major Mike Darcy, the commanding officer of SWAT, who is not a defendant in this action. Doc. 1, ¶ 17. There is no indication in the Complaint that either the Commissioner or the Union Defendants were involved in that promotion in any way. Also, there are no facts to suggest that the Union Defendants knew this appointment was going to occur, nor that they did not oppose it.[25]

Thereafter, in October 2015, the Commissioner interacted with the Union Defendants before taking Plaintiff out of his Operations Sergeant position.  *Id.*, ¶¶ 49-51.  The simple fact that Mercer was promoted after resigning from the Union and initiating a lawsuit against it does not negate the allegation that the Commissioner decided to transfer  him after her alleged closed-door meeting with Matthews.  *See* Part II.B.1.c.3. (captioned "Timeline - Causation"), *supra*.

In addition, according to Plaintiff, the Old Saybrook fatality incident presented the Union Defendants with a convenient "pretext" – *i.e.,* concern about Plaintiff's command during that event

---

[25]  In fact, as the Union Defendants acknowledge, they later took action to oppose Mercer's appointment to SWAT Operations Supervisor.  On June 22, 2015, "Union President Matthews filed an institutional grievance over Sgt. Mercer's appointment," alleging as a pretext that there was "no selection process . . . used," as required by the CBA.  Doc. 1, ¶¶ 21, 58.

– to help initiate the transfer by the Commissioner. Doc. 1, ¶ 58. In sum, the Court finds that the timeline in the Complaint does not negate the alleged causal connection between Plaintiff's exercise of his constitutional rights and his transfer at the hands of the Commissioner and the Union Defendants.

### 2. Count Two - Violation of Conn. Gen. Stat. 31-51q

The Union Defendants request that the Court dismiss Count Two against them because it fails to state a claim upon which relief may be granted under Rule 12(b)(6), Fed. R. Civ. P. In that count, Plaintiff alleges that "Defendants' actions of transferring Sgt. Mercer, or seeking his transfer, due to his nonmembership and/or objections to the payment of political and other non-bargaining expenditures, and/or advocacy on behalf of the rights of nonmembers, [were] violations of Sgt. Mercer's freedom of speech and association rights protected under the Constitutions of the United States and the State of Connecticut." Doc. 1, ¶ 84. Plaintiff concludes that because these actions violated his rights to free speech, the Union Defendants violated Connecticut General Statutes § 31-51q. As set forth *supra*, that statute provides, in relevant part, that "[a]ny employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise" of his or her rights under the First Amendment of the United States Constitution or sections 3, 4 or 14 of article first of the Connecticut Constitution, "shall be liable to such employee for damages."

The Union Defendants argue that they were never Plaintiff's employers so that § 31-51q has no application to them. Earlier in this Ruling, the Court found that the Commissioner was not Mercer's "employer" for purposes of § 31-51q. *See* Part II.B.2. (captioned, "Count Two - Retaliatory Discipline or Discharge - Conn. Gen. Stat. § 31-51q), *supra.* The Court now examines whether the

Union Defendants may be considered "employers" under that statute.

In *Varley v. First Student, Inc.*, 158 Conn. App. 482 (2015), the Connecticut Appellate Court addressed the issue of the definition of the word "employer" under Conn. Gen. Stat. § 31-51q. Noting that the statute itself did not define the term, the court followed case precedent in statutory construction by interpreting "employer" with its "natural and usual meaning." 158 Conn. App. at 497. The *Varley* court turned to "various dictionaries" to evaluate the trial court's definition, which was "[o]ne who employs the services of others; one for whom employees work and who pays their wages or salaries." *Id.* at 498. For example, consulting Black's Law Dictionary (9th Ed. 2009), the Connecticut Appellate Court noted that "employer" is generally defined as "[a] person who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages." *Id.*

The *Varley* court next determined that "[t]he definition [of employer] applied by the [trial] court [was] consistent with that set forth in several related statutes in title 31, chapter 557, part II of the General Statutes, all of which pertain to regulations concerning the protection of employees, and which specifically define "employer" as "a person engaged in business who has employees. . . ." 158 Conn. App. at 499 (citing Conn. Gen. Stat. §§ 31-40c(a)(2); 31-40j(2); 31-40q(a)(2); 31-40t(a)(2); and 31-51m(a)(2)). Accepting what it termed an "ordinary" definition of "employer," the Connecticut Appellate Court concluded, "There is no indication that the legislature intended the term 'employer,' as it is used in § 31–51q, to have a meaning different from its ordinary usage, as embodied in the aforementioned statutes." *Id.*

With these "ordinary" definitions of "employer" in mind, the *Varley* court held that the defendant school district was not the plaintiff bus driver's "employer" under § 31-51q. The driver

had been employed by First Student Transportation ("First Student"), which in turn had contracted with the school district to provide transportation services for the district. The fact that there was a contract between the school district and First Student for bus services did not make the plaintiff an employee of the school district. Therefore, when representatives of the school district requested First Student to discontinue the use of plaintiff's services on certain routes, it was not acting as her employer so could not be held liable under § 31-51q. "[S]ummary judgment properly was rendered in favor of the defendant on [this ] count of the plaintiff's complaint." *Id.* at 501. *See also e.g.*, *Nyenhuis v. Metro. Dist. Comm'n*, 604 F. Supp. 2d 377, 385 (D. Conn. 2009) ("[Plaintiff's co-workers] Harding and Danville are not employers of the plaintiff. Therefore, the motion to dismiss is being granted as to Harding and Danville with respect to this count [Conn. Gen. Stat. § 31-51q].");

*D'Angelo v. McGoldrick,* No. CV 93 0063904, 1995 WL 476843, at *6 (Conn. Super. Ct. Aug. 3, 1995) (Connecticut State troopers' § 31-51q claim against captain who recommended his transfer to another unit did not make that captain his "employer" for purposes of the statute; the captain "did not pay the salaries or wages of the plaintiffs, nor did he have authority to hire or discharge them;" he "did not even have the final authority to transfer the plaintiffs," but merely recommended the transfers to his superiors; instead he was simply an agent of the plaintiffs' actual employer, the State of Connecticut, and "§ 31-51q does not authorize an action against an employer's agent."), *aff'd,* 239 Conn. 356 (1996). *See also Epworth v. Journal Register Co.*, No. CV94 0065371, 1994 WL 613432, at *4 (Conn. Super. Ct. Oct. 31, 1994) (holding newspaper employer's publisher to be an "agent" of plaintiff's employer so that her "cause of action founded upon § 31-51q" could "not [lie] directly against an employer's agent" and was "insufficient as a matter of law"); *Smith v. Am. Fed'n of State & Mun. Employees (AFSCME) Council 4*, No. 05CV829 JBA, 2007 WL 735815, at *4 (D.

Conn. Mar. 8, 2007) (dismissing employee's § 31-51q claim [against union and individual union officials], alleging that the union "[d]efendants interfered with [her] rights to free speech," because "plaintiff's former employer, the CT DOC, is not a defendant in this case").

In the case at bar, "Mercer recognizes that the Union Defendants are not his employers pursuant to Conn. Gen. Stat. § 31-51q." Doc. 44, at 25. He thus essentially concedes, in his opposition memorandum, that his § 31-51q claim against the Union Defendants is fatally defective.

Nonetheless, Plaintiff states that he "contests the Union Defendants' claim that he was not 'discipline[d]' within the meaning of . . . § 31-51q."[26] *Id.* He asserts in his memorandum opposing the Union Defendants' motion that they actually "misread [his] allegations that he had not been subjected to discipline prior to his transfer with a concession that he was never disciplined at all." *Id.*, at 25. Rather, "[t]he whole crux of Mercer's complaint is clear that his transfer was unjustified punishment for his exercise of his constitutional rights." *Id.* Based on this premise that Plaintiff was disciplined by being transferred to a new position, his memorandum asserts that the complaint contains sufficient allegations of "discipline under Connecticut General Statute § 31-51q" that the "Union Defendants' claim must be rejected." *Id.,* at 26.

Because the Union Defendants are not his employers under § 31-51q, his claim must, in any event, be dismissed. However, the Court points out that, as set forth *supra*, Plaintiff has alleged sufficient facts to suggest that his transfer was a form of "discipline." *See* Part. II.B.2.*, supra.* His

---

[26] As to "discipline or discharge," the Union Defendants argue that Plaintiff was not subjected to either. First, he was transferred, not discharged. Moreover, they contend that he repeatedly admitted in his Complaint that he was not disciplined. *See* Doc. 1, ¶¶ 57, 60, 69. *See also*, *e.g., D'Angelo v. McGoldrick,* No. CV 93 0063904, 1995 WL 476843, at *4 (Conn. Super. Ct. Aug. 3, 1995) ("The [Connecticut State Police] plaintiffs cannot prevail on their [§ 31-51q] claim because a transfer from the one assignment to another is not discipline or a discharge."), *aff'd*, 239 Conn. 356 (1996)).

transfer to a new position may be viewed as "discipline" due to his loss of supervisory status and reduced pension due to unavailability of overtime hours.

Regardless of whethter Plaintiff's transfer constituted a form a "discipline," Count Two must, be dismissed against the Union Defendants because, as Mercer "recognizes" and concedes, Doc. 44, at 25, they "are not his employers," and § 31-51q explicitly pertains to violations by "any employer." The Union Defendants may have been agents of Mercer's employer, DESPP; but they were not Mercer's actual employers. There are no allegations to suggest that the Union Defendants hired Mercer, directed his work, or paid his wages. Absent proof of an express or implied employment contract between Plaintiff and the Union Defendants, Count Two will be dismissed as to these defendants.

### III. <u>CONCLUSION</u>

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Commissioner's Motion to Dismiss [Doc. 24] and the Union Defendants' Motion to Dismiss [Doc. 36]. Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), certain claims are dismissed, as described below.

As to the Commissioner, Count One for violation of 42 U.S.C. § 1983 may proceed against her in her individual capacity with respect to damages. The Court finds no basis in the Complaint's allegations to conclude that the Commissioner is entitled to "qualified immunity" at this time. However, as to the Commissioner's official capacity, to the extent that the Plaintiff seeks damages against her as commanding officer of the DESPP, for a First or Fourteenth Amendment violation under § 1983, that claim is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Plaintiff's § 1983 claim against the Commissioner in her official capacity for

damages (and/or retrospective relief for a violation of federal law under § 1983) fails to state a plausible claim because she is not, as a matter of law, a "person" subject to section 1983 liability. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983.").

Conversely, the Eleventh Amendment does not bar an action against a state official for violation of § 1983 if a plaintiff seeks an injunction regarding that official's future conduct. *See Will,* 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'") (quoting *Graham,* 473 U.S. at 167 n. 14). Accordingly, Plaintiff's claim against the Commissioner in her official capacity seeking prospective injunctive relief may proceed. In his Prayer for Relief, Plaintiff requests an injunction to prohibit all of the defendants in the action "from retaliating against [him] for exercising his First Amendment rights;" and to require the Commissioner "to transfer Plaintiff back into the full-time position of Operations Sergeant." Doc. 1, "Prayer for Relief," ¶¶ B.(i)-(ii). Because these are requests for future injunctive relief (regarding future and continuing constitutional violations), they may proceed.

With respect to the Union Defendants, Plaintiff's § 1983 claim may proceed against them for damages. Because the allegations in the Complaint may be construed to support a claim that they were willful joint participants in the Commissioner's decision to transfer Plaintiff from his Operations Sergeant position in SWAT, Plaintiff has stated a plausible claim that the Union Defendants acted under color of state law to deprive Plaintiff of his First and Fourteenth Amendment rights in violation of § 1983. *See Young v. Suffolk Cty.*, 705 F. Supp. 2d 183, 195 (E.D.N.Y. 2010) ("A private actor may be considered to be acting under the color of state law for purposes of § 1983

if the private actor was 'a willful participant in joint activity with the State or its agents.'") (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002)).

Finally, Count Two for violation of Conn. Gen. Stat. § 31-51q is DISMISSED as to all defendants. Plaintiff was not discharged, but the adverse effects of his transfer from his Operations Sergeant position in SWAT to an administrative position in Counter Terrorism – lower status and reduced fringe benefits – are sufficient to suggest that he was disciplined. *However,* his claims must be dismissed because none of the defendants – including the Commissioner and the Union Defendants – was his "employer" within the meaning of § 31-51q. Accordingly, his retaliatory discipline claim in Count Two is DISMISSED.

Because the Court has ruled on all pending motions to dismiss, the stay of discovery is LIFTED and the case shall proceed as to the remaining claim, Count One, in compliance with the parameters of this Ruling. The Commissioner and the Union Defendants must file their answers to that Count on or before **September 25, 2018.** In addition, the parties are directed to confer to propose amended case deadlines in preparation to file an amended joint Rule 26f Report on or before **October 9, 2018.** If the parties would like an opportunity to engage in a settlement conference at any time, they may request a referral to a Magistrate Judge for that purpose.

The foregoing is SO ORDERED.

Dated: New Haven, Connecticut
         August 28, 2018

                                         */s/Charles S. Haight, Jr.*
                                         CHARLES S. HAIGHT, JR.
                                         Senior United States District Judge